SIXTH DIVISION 

                                         June 26, 1998

  

No.  1-97-1039  

BRIAN ZDEB and                     )  Appeal from the

PRIME MEDICAL PRODUCTS, INC.,      )  Circuit Court of 

                                   )  Cook County

Plaintiffs-Appellees and      )

     Cross-Appellants,             )

                                   )

v.                            )                                                                  ) 

BAXTER INTERNATIONAL, INC., and    )

BAXTER HEALTHCARE CORPORATION,     )

                                   )  Honorable

Defendants-Appellants and     )  Willard J. Lassers, 

Cross-Appellees.              )  Judge Presiding.  

JUSTICE GREIMAN delivered the opinion of the court:

In a cause of action for tortious interference with a prospective economic advantage, a jury entered a verdict against defendants Baxter International, Inc., and Baxter Healthcare Corporation (collectively referred to as Baxter) and awarded approximately $8 million in damages to plaintiffs Brian Zdeb (Zdeb) and Prime Medical Products, Inc. (Prime) (collectively referred to as plaintiffs).  We affirm. 

On appeal, Baxter asserts that the trial court erred (1) in denying Baxter's motion for judgment 
non
 
obstante
 
veredicto
; (2) in ruling that absolute privilege did not apply to a letter written by Baxter's in-house counsel that denied Zdeb a release to market a device he had developed (hereinafter referred to as the January 1991 letter); and (3) in failing to rule that a qualified privilege applied to the January 1991 letter.  In addition, Baxter challenges certain evidentiary rulings, jury instructions, and the damage award.  

On cross-appeal, plaintiffs request this court to consider several issues if we were to remand the matter for a new trial.  Since we affirm the judgment, we do not address the issues raised on cross-appeal.  

The product at issue in the present case is an infuser designed by Zdeb.  An infuser is a medical device used to infuse drugs into a patient on a constant flow basis.  Infusers used for this purpose are worn by the patient so that the patient can be ambulatory and receive drug treatment outside the hospital.  Infusers are disposable and portable so that a patient can wear an infuser in a pant or coat pocket and it injects drugs into the patient without altering the patient's routine.  It basically is a syringe, prefilled with medicine, that regulates a constant flow of the medicine into an administration tubing that then infuses the drug into the patient.  Infusion therapy is used to inject chemotherapy for cancer patients and antibiotics for serious infections. 

Baxter is a health care company that develops, manufactures, and markets a wide variety of health care products and services, including intravenous drug delivery systems known as infusers.  Baxter launched the first disposable elastomeric or balloon-type infuser and marketed them during the 1980s.  In 1990, Block Medical, a competitor of Baxter, launched another elastomeric infuser called the Homepump.  In 1992, McGaw, a third competitor, distributed another elastomeric infuser called Readymed.  The marketplace for disposable infusers is well established and profitable.  During the 1980s and currently, Baxter's I.V. Systems Division, located in Round Lake, Illinois, was and is responsible for developing and improving infuser products.  

During the 1980s Baxter employees developed improvements to the existing infuser technology.  In 1984, Steve Pearson, a Baxter engineer, devised a model for a disposable vacuum-powered infuser.  In 1984, Derek Walsh, a Baxter technician, created an improved infuser model that included a connector which is referred to by his name, the Walsh connector.  In March 1988, Richard Mitchell, another Baxter employee, invented "preload" to be used in vacuum infusion devices to produce a constant rate of flow of the drug throughout the entire infusion, which had previously been problematic.  To prevent the preloaded vacuum from dissipating during storage, preload in Mitchell's device also called for the chamber holding the drugs to be disconnected from the vacuum chamber.  Baxter's position was, and is, that Zdeb had been exposed to Baxter technology during his tenure as a Baxter employee and that three parts of the infuser created by Zdeb, after leaving its employment, incorporated Baxter technology: (1) preload; (2) the Walsh connector; and (3) storage.

From January 14, 1980, through December 6, 1988, Zdeb worked as an engineer at Baxter in Round Lake.  When hired, Zdeb signed an employment agreement that required him to protect the confidentiality of Baxter's trade secrets and other confidential information.  The agreement further provided that Baxter would own any inventions that related to its business which Zdeb conceived or reduced to practice during his tenure at Baxter or during a period of 90 days after his termination.  When his position with Baxter was eliminated in December 1988, Zdeb entered into a severance agreement that amended his employment contract and provided in relevant part that "[a]ll inventions or trade secrets developed by Brian Zdeb shall be the property of Brian Zdeb after 3/6/89 *** and shall not be treated as confidential information to Baxter."  Zdeb received compensation from Baxter until March 6, 1989, his effective date of termination.      

In April 1989, after leaving Baxter, Zdeb designed a device, referred to as the Zdeb infuser.  Zdeb conceived the idea of an infuser that used a vacuum to drive the infusion.  On October 31, 1989, Zdeb applied for a patent on his infuser and ultimately obtained the patent in August 1992.  In July 1989, Zdeb entered into a business relationship with Charles Manker, another former Baxter employee, and formed Prime for the purpose of marketing Zdeb's infuser.  Zdeb and Manker first pitched the Zdeb infuser to Baxter.   

During December 1989 and January 1990, Zdeb and Manker met with Baxter personnel three or four times to present the Zdeb infuser to Baxter.  During the meetings with Baxter personnel, Zdeb and Manker presented various models, diagrams, and engineering drawings of the Zdeb infuser.  

After the multiple meetings, Baxter executives informed  Manker that Zdeb had incorporated Baxter technology into the Zdeb infuser.  Manker responded that he was "totally shocked and taken aback."  Manker offered to assign the patents to Baxter if Baxter could show that Zdeb had taken ideas from Baxter to develop his infuser.  In subsequent conversations about the Zdeb infuser, Manker conveyed this offer to other Baxter personnel, including James Carne, Baxter's vice president of business development for the pharmacy group.  By March 1990, Manker and Zdeb ended their business relationship because of their unsuccessful efforts to market the Zdeb infuser to Baxter. 

In March 1990, Zdeb contacted Carne to present again his infuser to Baxter.  At Carne's suggestion, Zdeb met with and demonstrated his infuser to Steve Hessel, the person in charge of product development for Baxter's infusion systems group.  At this meeting, Hessel asked Zdeb if his device had a preload space in it and Zdeb responded "no."  Zdeb acknowledged that there was a gap in his infuser but stated that the gap was filled with silicone oil and was not a vacuum preload.   

Prior to March 1990, Zdeb had one or two meetings with Smith and Nephew Solopak (Solopak) about the Zdeb infuser.  Smith and Nephew was a multinational health care company headquartered in London, England, had 10 subsidiaries and operated in about 35 different countries.  Solopak was the United States subsidiary of Smith and Nephew, and had a significant presence in the infusion therapy market by 1990.  If Solopak obtained the Zdeb infuser, Solopak would have been Baxter's competitor in both the domestic and European markets.  

Between April and December 1990, Zdeb and Solopak engaged in negotiations, discussing licensing fees, royalties, incentive payments and consulting services.  Zdeb and Solopak reached agreement which was set forth in an unexecuted draft dated December 20, 1990.  

 During these negotiations, various attempts were made by Solopak personnel and Zdeb to confirm with Baxter that Zdeb owned this infuser technology.  C. Richard Piazza, president of Solopak in Chicago, was involved in the negotiations with Zdeb.  Upon reviewing Zdeb's employment agreement and the addendum to the employment agreement executed at Zdeb's leaving Baxter, Piazza understood that Zdeb "was free to pursue this product," 
i.e.
, the Zdeb infuser.  In January 1991, Piazza, frustrated by the lack of response from Baxter, talked to Terry Furness, a group president at Solopak.  Furness said that he had worked for 10 years at Baxter and he called James Tobin, the second-ranking executive at Baxter.  Furness told Tobin that Solopak was about to conclude a deal with Zdeb and they needed a response from Baxter about Zdeb's right to the technology.  Tobin said that he would look into the matter.  

Zdeb also made efforts to get a response from Baxter in order to conclude his deal with SoloPak.  Zdeb contacted Mark McGarvie, a Baxter attorney, and Paul Schaafsma, another Baxter attorney.  

Eventually, Baxter's attorney Schaafsma sent a letter dated January 31, 1991, to Zdeb and copied to several Solopak personnel.  The January 31 Baxter letter stated in relevant part: "With regard to the vacuum infuser described in your January submission, it is Baxter's position that this infuser was not solely developed by you while you were employed at Baxter.  It is based on a Baxter developed vacuum infuser prototype to which you were exposed while employed at Baxter.  

While the infuser in your January submission includes superficial design modifications which are different than Baxter's prototype, your infuser uses the same approach as Baxter's prototype to overcome the significant technological hurdles of end of infusion pressure drop, storage of the device without compromising the vacuum, and connection of the administration tubing to the pressurized fluid source.   Therefore, Baxter does not grant your request for a 'release' on the infuser."  

After receipt of this Baxter letter, Solopak terminated all relationship with Zdeb.  

Plaintiffs filed a two-count complaint against Baxter alleging tortious interference with prospective economic advantage (count I) and libel 
per
 
se
 (count II).  Baxter filed counterclaims, alleging that Zdeb breached his employment agreement with Baxter, misappropriated Baxter's trade secrets and confidential information.  In the pleadings that followed, Baxter filed the affirmative defense of justification.  Thereafter the trial court dismissed plaintiffs' libel 
per
 
se
 count and allowed the tortious interference count to proceed to trial. 

On September 30, 1996, trial commenced and continued for more than three weeks.  The jury returned a verdict in favor of plaintiffs on both the claim for tortious interference and on Baxter's counterclaims.  The jury awarded Zdeb $156,000, and Prime $7.9 million.  Thereafter, the trial court denied Baxter's posttrial motion.  

The critical issues for our consideration are whether the contents of the January 1991 letter are protected by an absolute privilege because the letter was executed by a lawyer or whether the contents are, at least, protected by a qualified privilege occasioned by a corporate officer and employees to protect the property rights of the corporation.  

Second, Baxter asserts that the absolute privilege provided in section 586 of the Restatement (Second) of Torts applies to the January 1991 letter as an attorney's communication relating to a seriously contemplated lawsuit and, therefore, Baxter is entitled to judgment 
n.o.v.
  Baxter argues that: (1) the protection afforded Baxter's attorney extends to Baxter as the attorney's employer under master/servant and principal/agent rules; (2) absolute privilege is recognized in causes of action other than defamation; and (3) absolute privilege applies to attorney communications made in contemplation of litigation.  We disagree.

Whether a statement is protected by absolute privilege is a question of law.  
Bushell v. Caterpillar, Inc.
, 291 Ill. App. 3d 559, 561 (1997); 
Barakat v. Matz
, 271 Ill. App. 3d 662, 667 (1995).  

Section 586 of the Restatement (Second) of Torts, which is included in the chapter entitled "DEFENSES TO ACTIONS FOR DEFAMATION," provides:  

"An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."  Restatement (Second) of Torts §586 (1977).  

The purpose of absolute privilege is stated, in relevant part, in Comment 
a
 of section 586: 

"
a
.  The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients.  Therefore the privilege is absolute.  It protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity."  Restatement (Second) of Torts §586, Comment 
a
, at 247 (1977).    

The scope of absolute privilege is addressed in Comment 
e
 of section 586:  

"
e
.  As to communications preliminary to a proposed judicial proceeding the rule stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration.  The bare possibility that the proceeding might be instituted is not to be used as cloak to provide immunity for defamation when the possibility is not seriously considered."  Restatement (Second) of Torts §586, Comment 
e
, at 248 (1977). 

In its memorandum and order denying Baxter summary judgment on plaintiffs' interference count, the trial court addressed Baxter's section 586 absolute privilege argument as follows: 

"The short answer to this assertion is that §586 by its terms protects counsel; it does not protect the client.   Here, plaintiff is suing Baxter, he is not suing Baxter's counsel.  A holding that §586 provides a shield to both counsel and the client would eviscerate the tort of intentional interference.  One intending to commit the tort could obtain an absolute shield by conveying information to the third party through an attorney."  

We agree with the trial court for several reasons.  First, the language of section 586 speaks directly and solely to attorneys, 
i.e.
, absolute privilege "protects the attorney from liability."  Restatement (Second) of Torts §586, Comment 
a
, at 247 (1977).  Second, the impenetrable shield of absolute privilege should not be extended or available for the possible widespread abuse recognized by the trial court, 
i.e.
, a party simply could convey information through an attorney and escape any liability by crying privilege.  The privilege's alleged limitation to communications relating to seriously contemplated litigation is not a safeguard feature as advanced by Baxter but, rather, a vast, limitless loophole into which all attorney communication could escape.  

In addition, Illinois courts have not extended the section 586 privilege to claims for intentional interference with prospective economic advantage, which was the only claim presented to the jury.  Plaintiffs correctly observe that section 586: (a) falls within the Restatement sections entitled "DEFAMATION: DEFENSES"; (b) expressly states that an attorney is privileged to "publish defamatory matter"; and (c) provides, in comment 
e
 that the privilege "protects the attorney from liability 
in an action for defamation
."  (Emphasis added.)  Restatement (Second) of Torts §586, Comment 
e
 (1977).        

Notwithstanding these facts, Baxter maintains that the absolute privilege allowed in defamation actions under section 586 has been extended by Illinois courts to causes of actions other than defamation, relying on 
McGrew v. Heinold Commodities, Inc.
, 147 Ill. App. 3d 104, 115 (1986).  Baxter's argument is misleading.  

The 
McGrew
 case concerned a false light claim, which is recognized in section 652A of the Restatement (Second) of Torts as an invasion of privacy cause of action.  Restatement (Second) of Torts §652A (1977).  This court in 
McGrew
 applied the Restatement's absolute privilege to the false light claim, noting that 
section 652F expressly provides that the rules on absolute privileges as stated in the defamation section apply to invasion of privacy suits.  
McGrew
, 147 Ill. App. 3d at 114; Restatement (Second) of Torts §652F (1977).  Accordingly, as the Restatement afforded absolute privilege for defamation actions under section 586, the Restatement expressly afforded the privilege under section 652F to false light claims.  

For all of the above-stated reasons, we find that absolute privilege under section 586 does not apply to the January 1991 letter.  In light of this holding, we also reject Baxter's alternative assertion that the trial court erred in refusing to give a jury instruction on section 586 absolute privilege.  

Baxter asserts that absolute privilege should apply based on section 587 of the Restatement (Second) of Torts, which is directed to parties, not attorneys, in judicial proceedings (Restatement (Second) of Torts §587 (1977)).  We find that Baxter waived this theory because Baxter first raised section 587 in its posttrial brief. 

"[I]ssues raised for the first time in a post-trial motion will not be considered."  
Antol v. Chavez-Pereda
, 284 Ill. App. 3d 561, 566 (1996) (the issue of duty, even though such an issue is a question of law, was waived on appeal in a negligence action).  The rules are well settled: 

"The theory upon which a case is tried cannot be changed upon review.  ***  It is also a rule that a party will not be permitted to argue on appeal a defense not interposed by his answer.  [Citations.]   The fact that certain evidence lends support to the defense does not mitigate the force of this rule [citation] and asserting a new defense in final argument does not do so.  ***  The issues are determined from the pleadings and the evidence.  To have evidence without pleading an issue is just as fatal as pleading an issue and not supporting it with evidence.  Both are essential and each must conform to the other."  
Consoer, Townsend & Associates v. Addis
, 37 Ill. App. 2d 105, 109-10 (1962). 

Applying these rules, this court in 
Addis
 restricted its opinion "to the one defense raised in the answer and to the one theory upon which the case was tried."  
Addis
, 37 Ill. App. 2d at 110;  see also, 
e.g.
, 
Ellerby v. Spiezer
, 138 Ill. App. 3d 77, 80 (1985) (a party's failure to plead a claim in his answer waived that claim on review); 
Kaufman & Broad Homes, Inc. v. Allied Homes, Inc.
, 86 Ill. App. 3d 498, 502 (1980) (waiver applied where the defense was not set forth in the pleadings and the new defense was asserted for the first time in final argument). 

In the present case, the record reveals that in its motion for summary judgment, Baxter posited that absolute privilege under section 586, not section 587, applied to the January 1991 letter.  In their memorandum in opposition to Baxter's motion for summary judgment, plaintiffs specifically opposed Baxter's section 586 theory.  In its memorandum and order, the trial court expressly considered and rejected Baxter's absolute privilege theory premised on section 586.  In addition, in its proposed jury instruction on absolute privilege, Baxter specifically relied on section 586.  Baxter first mentioned section 587 in its posttrial motion.  Section 587, which applies to parties in a judicial proceeding, clearly raises an entirely different theory than section 586, which applies to attorneys.  Thus, we find that Baxter waived the issue of absolute privilege under section 587. 

The real heart of this case relates to the possible existence of a qualified privilege and who must plead and prove such a qualified privilege.  

Baxter asserts that the January 1991 letter was qualifiedly privileged, as a matter of law, because it was (1) an action to protect its proprietary and commercial interests, and (2) a response to an authorized inquiry.  In its appellate brief, Baxter argues that "[t]he trial court erroneously failed to make an initial determination that Baxter had a qualified privilege defense to plaintiffs' tortious interference claim."  

Plaintiffs contend that Baxter waived this issue because it filed an affirmative defense of justification.  Plaintiffs further argue that their complaint nowhere suggested that Baxter acted pursuant to a recognized privilege and, in fact, expressly alleged that Baxter's conduct was not privileged and Baxter's statements were false.  

In the present case, just prior to trial, Baxter filed a motion 
in
 
limine
 asserting that the trial court should determine whether Baxter's actions were protected by qualified privilege.  The trial court denied this motion, stating that "the jury is going to have to decide whether there *** is justification for this by virtue of intellectual patent or whatever."  By its ruling, the trial court rejected the existence of qualified privilege and ordered that the trial would proceed on Baxter's written affirmative defense of justification.  

"In Illinois, the issue of whether a qualified privilege exists has been a question of law for the court, and the issue of whether the privilege was abused has been a question of fact for the jury."  
Kuwik v. Starmark Star Marketing & Administration, Inc.
, 156 Ill. 2d 16, 25 (1993); 
Barakat
, 271 Ill. App. 3d at 667 (whether a statement is protected by a qualified privilege is question of law to be determined by the court).  Qualified privilege can apply in an action for interference with a prospective economic advantage.  
Fellhauer v. City of Geneva
, 142 Ill. 2d 495, 512 (1991).  

Whether or not a qualified privilege exists determines the burden of proof upon the respective parties.  Where the conduct of the defendant is privileged, the plaintiff bears the burden to plead and prove that the defendant's actions were unjustified or malicious.  
Fellhauer
, 142 Ill. 2d at 512-13.  Where the conduct of the defendant does not invoke a privilege, the defendant shoulders the burden to plead and prove justification as an affirmative defense.  
Roy v. Coyne
, 259 Ill. App. 3d 269, 283-84 (1994).  

Courts will recognize a privilege "where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights."  
HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.
, 131 Ill. 2d 145, 157 (1989).  

In 
HPI Health Care
, the supreme court found that the defendants' actions were privileged and held that "the duty owed by hospital management companies to their hospitals should take precedence over their duty to the hospitals' contract creditors."  
HPI Health Care
, 131 Ill. 2d at 157-58.  In its reasoning, the supreme court analogized to three prior decisions in which it "recognized a privilege for corporate officers and directors to use their business judgment and discretion on behalf of their corporations."  
HPI Health Care
, 131 Ill. 2d at 157.  "The existence of the privilege was based upon this court's recognition that the duty of corporate officers and directors to their corporations' shareholders outweighs any duty they might owe to the corporations' contract creditors."  
HPI Health Care
, 131 Ill. 2d at 157.  Courts have also held that an employer may invoke conditional privilege to respond and disclose limited information to prospective employers.  
Anderson v. Vanden Dorpel
, 268 Ill. App. 3d 907, 917-18 (1995) (and cases cited therein), 
rev'd on other grounds
, 172 Ill. 2d 399 (1996).  

To determine whether a privilege applies, the court looks to the complaint.  "[I]f the complaint may not fairly be said to introduce the existence of a recognized statutory or common law privilege, it is not the duty of the plaintiff to plead and prove lack of justification, but it becomes the defendant's burden to plead and prove the privilege as an affirmative matter, for there may be no way for a plaintiff to know in advance whether the defendant enjoys a privilege or, indeed, whether he will ever claim that he does."  
Roy
, 259 Ill. App. 3d at 283.  

We first observe that the decisions in 
HPI Health Care
 and 
Roy
 involved pleadings and motions under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1996)), in contrast to the instant appeal, which comes to us after a trial lasting nearly four weeks, a jury verdict and a $7.9 million judgment.  Most notably, however, in the instant case, Baxter filed an affirmative defense specifically in response to the 
Roy
 decision.  

In 
Roy
, the court painfully concluded that 
HPI Health Care
 had imposed upon the trial court the curious allocation formula for the burden of proof, 
i.e.
, the plaintiff has the pleading and proof burdens if a qualified privilege is apparent but the defendant has such burdens by way of affirmative defense in the absence of a qualified privilege being fairly disclosed by the complaint.  Were we writing with a clean slate, we would ignore this subtle distinction and allow the issue of justification to be raised by the defendant in the form of an affirmative defense.  However, we are an intermediate court of review and must follow the dictates of our supreme court and give deference to precedent in our own district.  

In any event, the specific allegations of plaintiffs' complaint are somewhat murky as to whether a conditional privilege is fairly shown.  Paragraph 34 of the complaint alleges that during September and October of 1990, "Baxter was advised by SoloPak of the negotiations with Zdeb about a license of the PCA and the Zdeb Infuser."  The complaint does not provide a context for the manner in which Baxter was "advised" and only in the January 1991 letter by Baxter attached to and incorporated into the complaint do we find a reference to "your non-confidential submission of January 17, 1991."  The complaint is silent as to any inquiry by Zdeb, the recipient of the letter, and states conflicting dates of reference between the fall of 1990 and January of 1991.  In addition, paragraph 42 of the complaint expressly states that Baxter's actions were "without justification or a privilege" and further alleges malicious intent on the part of Baxter.  

After the entry of the 
Roy
 decision, Baxter filed a motion for leave to amend its affirmative defenses.  In its motion, Baxter stated that the 
Roy
 "court held that, with certain limited exceptions, defendants now bear the burden of pleading and proving justification to interfere with a plaintiff's prospective economic advantage; prior to the 
Roy
 decision, a defendant's lack of justification was considered an element of the plaintiff's 
prima
 
facie
 case."  By its filing of this affirmative defense based on 
Roy
, Baxter assumed the burden as stated therein.  Moreover, Baxter never asked for leave to withdraw this affirmative defense.  

We are faced with the difficulty imposed upon the parties by 
HPI Health Care
.  As 
Roy
 indicates, a plaintiff is faced with a dilemma as to whether his complaint introduces a privilege.  Perhaps, if the present plaintiffs had filed their complaint after the 
Roy
 decision had been entered, they would have opted to omit paragraph 42, which alleged that Baxter acted "without justification or privilege to do so," because that allegation may be deemed to have raised, rather than denied, a privilege.  

In the case at bar, Baxter is faced with the other side of that dilemma.  If Baxter concludes that the complaint establishes a qualified privilege, a denial of the allegation negating justification is all that is required of it.  If the existence of the privilege is less clear, Baxter will be required to raise justification by affirmative defense.  Here, Baxter put its dilemma to rest by filing its amended affirmative defenses based on 
Roy
.  Important litigation should not turn upon such a Catch- 22!  We believe that the circumstances of the instant case, therefore, fall within an exception to 
HPI Healthcare
.  

Accordingly, the trial court conducted the trial and instructed the jury on the basis of the filed affirmative defense, which was never withdrawn.  The issues of justification and qualified privilege were appropriately and fairly considered during this trial.  

In conjunction with this finding, we also hold that the jury instructions on this issue properly stated the law.  The jury instruction on justification as an affirmative defense, as opposed to lack of justification as an element of the plaintiffs' cause of action, was correct.  As stated in the jury instructions, defendants asserted the affirmative defense of justification and had the burden of proving the affirmative defense.   

Next, Baxter asserts that the jury instructions included an incorrect standard for justification.  Baxter argues that a "reckless disregard of the truth" standard should apply based on  
Kuwik
, 156 Ill. 2d 16.  We reject Baxter's assertion because, unlike the present case, a qualified privilege applied in the 
Kuwik
 case.  
Kuwik
, 156 Ill. 2d at 30 ("to prove an abuse of the qualified privilege").  Under the circumstances of this case, Baxter asserted justification as an affirmative defense.  In addition, the cause of action in 
Kuwik
 was for defamation and there is no authority for the ruling to apply to a cause of action for interference with a prospective economic advantage. 

Nonpublishable material under Supreme Court Rule 23 omitted.

For all of the foregoing reasons, we affirm the judgment of the trial court. 

Affirmed. 

ZWICK and QUINN, JJ., concur.