2014 IL App (2d) 131131
No. 2-13-1131
Opinion filed December 22, 2014

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| PYRAMID DEVELOPMENT, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
|     Plaintiff and Counterdefendant- | ) | |
|     Appellant, | ) | |
| | ) | |
| v. | ) | No. 09-L-113 |
| | ) | |
| DUKANE PRECAST, INC., and M.B. | ) | |
| FINANCIAL BANK, INC., | ) | |
| | ) | Honorable |
|     Defendants and Counterplaintiffs | ) | Terence M. Sheen, |
|     -Appellees. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Burke and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal arises out of mechanic's lien litigation stemming from construction of the Bluff Townhomes in Hinsdale, Illinois.    For the reasons that follow, we affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3    In March 2007, Dr. Husam Aldairi and plaintiff, Pyramid Development, LLC, entered into a written contract for plaintiff to construct eight townhome units, which became known as the Bluff Townhomes, in unincorporated Hinsdale.    The contract price was $3,030,000.    Plaintiff was a construction manager, owned no equipment, had no employees, and hired

subcontractors to do all of the work. Plaintiff's principal was Ramy Saif. When plaintiff and Aldairi contracted to build the Bluff Townhomes, they already had a working relationship. Plaintiff was working, or had worked, on approximately seven different projects for Aldairi. Regarding the Bluff Townhomes, Aldairi required plaintiff to submit sworn affidavits with each draw. Broadway Bank was Aldairi's lender. Defendant, M.B. Financial Bank, Inc. (Bank), is Broadway Bank's successor.

¶ 4 Plaintiff contracted with defendant, Dukane Precast, Inc. (Dukane), to furnish prefabricated concrete slabs, which were to form the walls and floors of the townhomes. The contract price with Dukane was $1,040,000. Dukane delivered the materials, and they were incorporated into the townhomes. However, Saif noticed problems. The slabs were uneven; there were gaps between the walls and the floors; the electrical boxes in the walls were not even and straight; and the conduit between some of the walls was plugged with concrete.

¶ 5 Completion of the townhome development required the erection of retaining walls, which held up dirt, on the property. The west wall was completed while plaintiff was still the general contractor, but due to burgeoning difficulties between plaintiff and Aldairi, Aldairi had someone else finish the contiguous north and east wall. Eventually that wall failed at the northeast corner. In January 2009, Aldairi terminated plaintiff.

¶ 6 During lengthy litigation, Aldairi filed for bankruptcy protection. Aldairi entered into a consent judgment with the Bank, and the Bank eventually sold the property to a party not associated with the litigation. The Bank assumed the duty to pay plaintiff's mechanic's lien claim, and the Bank claimed that it had paid to repair the failed retaining wall. In June 2012, the trial court heard, in a single trial, plaintiff's claim to foreclose its mechanic's lien, Dukane's claim against plaintiff for breach of contract, plaintiff's claim against Dukane for breach of

contract, and the Bank's claim for a setoff against plaintiff for the repair of the retaining wall. To aid in understanding the evidence, we treat the issues involving the mechanic's lien and the Bank separately from the issues involving plaintiff's and Dukane's breach-of-contract claims.

¶ 7                                     The Mechanic's Lien Foreclosure

¶ 8     This phase of the trial presented two issues: plaintiff's right to a mechanic's lien and the Bank's right to a setoff against any award to plaintiff.   Plaintiff filed a claim for a lien on May 6, 2009.   The lien claim states that plaintiff's last day of work was January 15, 2009, and that $235,000 was owed for improvements on the premises.

¶ 9     Pursuant to Aldairi's request as the owner of the property, plaintiff furnished a contractor's sworn statement with each draw.   In all, plaintiff submitted six draws.   Aldairi approved the first five, and they were paid.   Aldairi did not approve the sixth draw, which was not paid.

¶ 10    A significant issue was what caused the retaining wall to fail.   Saif testified that a cause of the failure was Aldairi's insistence on planting trees around it instead of the bushes called for in the original plans.   According to Saif, the tree roots damaged the wall.   Saif also testified that a heavy machine had fallen against the wall, causing damage.   According to Dallas Williams, an architect presented by the Bank, the wall was built incorrectly.   Williams took the wall apart and found that it contained too little of a material called geogrid, which was needed to give the wall structure.   In Williams' opinion, the wall had to be rebuilt, and he testified that $145,000 was a reasonable cost to fix the wall.   That amount was purportedly reflected on an invoice submitted by a contractor that had rebuilt the wall.   Plaintiff's expert testified that it would cost approximately $70,000 to $80,000 to fix the wall.

¶ 11    Another issue was the accuracy of the contractor's sworn affidavits that Saif prepared and submitted to Aldairi pursuant to Aldairi's request that such sworn statements accompany each draw.    Saif admitted that the sworn affidavits were not accurate.    According to Saif, the subcontractors' names listed on the affidavits were not accurate, because "the names honestly change all the time."    Saif testified that, for example, Tri-Star Electric did the electrical work, but he did not list it on the affidavits for draws one through six.    According to Saif, plaintiff did none of the actual work; however, he listed plaintiff on the sworn affidavits as having done various jobs.    Saif testified that plaintiff did not keep any records of which subcontractors performed work on the Bluff Townhomes.    According to Saif, "none of the numbers [on the sworn affidavits] are exact numbers."    He testified that the numbers on the sworn affidavits were "estimates" and that the numbers reflected "large cushions on every single line item."    Saif did not obtain lien waivers from any of the subcontractors.

¶ 12    Plaintiff offered exhibit number 32A to support its lien claim.    The group exhibit consisted of copies of canceled checks that Saif attributed to the construction of the Bluff Townhomes.    He testified that he placed check marks next to those checks that pertained to plaintiff's lien claim.    He also testified that the checks were originally written for all of Aldairi's projects, not just the Bluff Townhomes, and that he had to "decipher" prior to trial "what checks go where."    According to Saif, that was "hard to figure out."

¶ 13                          Dukane's Concrete Work

¶ 14    After Saif noticed the problems with Dukane's precast concrete slabs, Dukane representatives met with Saif on May 7, 2008, at the Bluff Townhomes to resolve the issues.    One of Dukane's proposed solutions was to cut the prefabricated concrete walls to run conduit through them.    Because those walls were load-bearing, Saif rejected that proposition.

Plaintiff's expert, Adel Awad, testified that cutting and patching concrete was a bad solution, because the patched concrete would crack. As for repairing the uneven floors, Awad testified that the cost of the plywood needed for the repairs would vary from room to room and unit to unit. Saif's solution for the walls was to "fur" by placing wooden strips at various intervals on the walls, running conduit between the walls and the strips, and then installing drywall over the strips. Saif testified that the repairs were done by subcontractors that plaintiff hired.

¶ 15 When the repairs were finished, plaintiff invoiced Dukane $240,000, as the cost of the completed repairs, which Saif said he "thought" Dukane had agreed to pay. The "itemized invoice," which was plaintiff's exhibit number 18, totaled $240,000 for "framing and material of 8 town house units," but it did not break down the numbers by listing the subcontractors that furnished the labor and materials. Instead, the invoice used base numbers, such as $4,000 for framing, and then multiplied that number times eight townhomes. Saif testified that he obtained the base numbers from the RS Means guide, which is a manual that construction contractors use to estimate construction costs. Dukane rejected plaintiff's "itemized invoice" and demanded "signed work sheets with labor hours and material invoices" for each item. In response, plaintiff submitted a document entitled "Dukane Repairs," which was plaintiff's exhibit number 40. The document listed subcontractors, the checks paid to them, and the dates they were paid. Exhibit 40 totaled repairs at $228,351.30. Saif again referenced plaintiff's exhibit 32A, the canceled checks. He testified that he had placed a "D" next to those that, as nearly as he could reconstruct, pertained to the repairs of Dukane's defective work. On cross-examination, Saif testified that none of the figures on any of the documents were accurate. Saif testified that he kept no records of which subcontractors performed work. Thad Martin Gleason, plaintiff's architect, priced the cost of repairs, also using the RS Means guide.

¶ 16    For its part, Dukane presented evidence that its original contract price with plaintiff was $1,040,000.    At the time of trial, plaintiff had paid Dukane $1 million.    With approved and disputed extras, Dukane's net contract price was $1,070,545, leaving a balance due of $70,545. In closing argument, plaintiff admitted that it owed Dukane a balance under the contract, but it calculated the balance by deleting the amount of the disputed extras.    Plaintiff argued that it owed Dukane $50,395.

¶ 17                          Plaintiff's Rebuttal Evidence

¶ 18    During plaintiff's case-in-chief, Dukane elicited testimony pertinent to its counterclaim against plaintiff for the balance due under the contract, in order to accommodate the witnesses' schedules.    When plaintiff rested its case-in-chief, it indicated that it would respond to Dukane's evidence in rebuttal.    Plaintiff called Saif in rebuttal.    Saif testified to matters responsive to the Bank's case-in-chief, but he was not questioned regarding Dukane's evidence. The Bank cross-examined Saif, but Dukane did not.    Then, on redirect, plaintiff sought to question Saif about the Dukane matters.    Dukane objected, and the court sustained the objection.    Plaintiff's attorney stated, "All right.    So we're done."    Plaintiff did not make an offer of proof.

¶ 19                          The Trial Court's Judgment

¶ 20    The trial court rendered its decision in a written memorandum.    The court found Saif to be not credible.    The court commented that he was "evasive and disruptive," and the court found that he was impeached on material issues.    The court also found that plaintiff "literally had no records in relation to any work done" on the Bluff Townhomes.    The court found that plaintiff had admitted owing Dukane a balance under the contract, which the court determined was $50,395.    The court found that the disputed extras had come about after the controversy

between Dukane and plaintiff arose. The court denied any recovery on plaintiff's claim against Dukane for the cost of repairs, finding that plaintiff did not sustain its burden of proof as to the cost of materials and labor. The court reasoned that a set fee was contrary to Awad's opinion that different "materials and amounts were need[ed] for each fix." The court further found that "there was no evidence that Dukane was not [*sic*] given an opportunity to cure its defective performance." The court stated that the evidence established that, if given a chance, Dukane would have been able to cure its defective performance.

¶ 21 With respect to the issues between plaintiff and the Bank, the court found that plaintiff was entitled to a mechanic's lien because Aldairi and the Bank waived the requirement of section 5 of the Mechanics Lien Act (Act) (770 ILCS 60/5 (West 2008)) that the contractor provide sworn affidavits listing the names of all subcontractors and the amounts due or to become due. The court adjudicated plaintiff's mechanic's lien at $35,340.47. The court then found that the Bank was entitled to a setoff in the amount of $145,000 for the cost of repairing the retaining wall, based on Williams' testimony. The court ruled that, because the Bank's setoff exceeded the amount of plaintiff's lien, the lien was extinguished. Following the court's denial of its posttrial motion, plaintiff filed a timely appeal.

¶ 22                                    II. ANALYSIS

¶ 23                 Whether the Trial Court Correctly Granted the Bank a Setoff

¶ 24 Plaintiff first contends that the Bank was not entitled to a setoff. Plaintiff argues that (1) the Bank did not plead a right to a setoff; (2) the Bank had no right to a setoff under the Act; and (3) if the Bank were entitled to a setoff, the trial court incorrectly calculated the amount of plaintiff's lien. The Bank argues that plaintiff's lien was invalid because of its failure to comply with section 5 of the Act. We are concerned here with the contractor's duty to give the

owner a section 5 sworn affidavit and what happens when the owner pays the contractor despite the owner's notice of the falsity of the affidavit. The trial court believed that the owner waives the requirements of section 5, leaving the contractor's lien intact. On the other hand, the Bank argues that the failure to comply with section 5 defeats the contractor's lien. Only after we address this issue will we address plaintiff's arguments regarding the setoff, because if the Bank is correct, the issues surrounding the setoff will be moot. However, we note that plaintiff's first two arguments, which could have been raised earlier, were raised for the first time in plaintiff's posttrial motion. Issues raised for the first time in a posttrial motion will not be considered on review. *Zdeb v. Baxter International, Inc.*, 297 Ill. App. 3d 622, 630 (1998).

¶ 25 The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *Cityline Construction Fire & Water Restoration, Inc. v. Roberts*, 2014 IL App (1st) 130730, ¶ 9. The best evidence of legislative intent is the language of the statute, which is given its plain and ordinary meaning. *Cityline*, 2014 IL App (1st) 130730, ¶ 9. It is well settled that the Act must be strictly construed with respect to all of the statutory requirements upon which the right to a lien depends. *Cityline*, 2014 IL App (1st) 130730, ¶ 10. A mechanic's lien is valid only if each of the statutory requirements is scrupulously observed by the party invoking the benefits of the Act. *Cityline*, 2014 IL App (1st) 130730, ¶ 10. The statute must be read as a whole and construed so that no part is rendered meaningless or superfluous. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 390 (2009). The court will not depart from the statute's plain language by reading into it exceptions, limitations, or conditions that conflict with the legislative intent. *Weather-Tite*, 233 Ill. 2d at 390. This appeal requires us to construe the Act, which we review *de novo*. *People ex rel. Madigan v. Bertrand*, 2012 IL App (1st) 111419, ¶ 20.

¶ 26    The purpose of the Act is to protect contractors and subcontractors who furnish labor and materials that benefit the property, by permitting a lien on the premises. *Weather-Tite*, 233 Ill. 2d at 391. The Act is comprehensive and defines the rights and responsibilities of parties involved in construction contracts. *Sanaghan v. Lawndale National Bank*, 90 Ill. App. 2d 254, 257-58 (1967). The purpose of the contractor's section 5 sworn affidavit is to put the owner on notice of subcontractors' claims. *Weather-Tite*, 233 Ill. 2d at 393. The owner has the right to rely and act upon the contractor's section 5 sworn affidavit unless the owner has any reason to suspect that it was false or knows that it was false. *Knickerbocker Ice Co. v. Halsey Bros. Co.*, 262 Ill. 241, 245 (1914); *Krack Corp. v. Sky Valley Foods, Inc.*, 133 Ill. App. 2d 469, 472 (1971). The owner is protected against subcontractors that were not listed on the contractor's sworn affidavit unless the owner knows of the omissions or has colluded in their omission, in which case the subcontractor can enforce its lien against the owner. *Gerdau Ameristeel US, Inc. v. Broeren Russo Construction, Inc.*, 2013 IL App (4th) 120547, ¶ 29.

¶ 27    Section 5 of the Act provides in pertinent part:

> "It shall be the duty of the contractor to give the owner, and the duty of the owner to require of the contractor, before the owner or his agent *** shall pay or cause to be paid to the contractor *** any moneys ***, a statement in writing, under oath or verified by affidavit, of the names and addresses of *all parties* furnishing labor, services, material, fixtures, apparatus or machinery, forms or form work and of the amounts due or to become due to each." (Emphasis added.) 770 ILCS 60/5 (West 2008).

The purpose of section 5 is to protect owners from the claims of unknown subcontractors. *Gerdau*, 2013 IL App (4th) 120547, ¶ 29. The owner does this by requesting of the contractor a section 5 sworn affidavit listing the subcontractors and the amounts owed them or to become due

to them. *Abbott Electrical Construction Co. v. Ladin*, 144 Ill. App. 3d 974, 977 (1986). Then, pursuant to section 24 of the Act, the owner must retain funds sufficient to pay the subcontractors. *Weather-Tite*, 233 Ill. 2d at 392. However, if the owner does not request a section 5 sworn affidavit, the contractor is under no duty to give it (*Abbott*, 144 Ill. App. 3d at 977), and the owner is unprotected against having to pay twice for the same work. *Lazar Brothers Trucking, Inc. v. A&B Excavating, Inc.*, 365 Ill. App. 3d 559, 563 (2006). Where the owner requests a section 5 sworn affidavit, the contractor must give the owner the *names* of all parties furnishing labor or materials and the amounts due each of them, or to become due each of them, under oath or verified by affidavit, and the necessary names cannot be supplied by reference to lien waivers or other documents. *Deerfield Electric Co. v. Herbert W. Jaeger & Associates, Inc.*, 74 Ill. App. 3d 380, 385 (1979).

¶ 28    Here, it is undisputed that Aldairi requested that plaintiff give him section 5 sworn affidavits with each draw. It then became plaintiff's duty to furnish sworn affidavits that complied with the technical requirements of section 5. See *Abbott*, 144 Ill. App. 3d at 979 (if the owner requires that the contractor supply a list of subcontractors as described in section 5, the contractor must comply). It is also undisputed that plaintiff's sworn affidavits were not only noncompliant, but false. The falsity was apparent on the face of the sworn affidavits where plaintiff was listed, when plaintiff clearly was not a subcontractor and did not itself furnish any labor or materials. Because of Aldairi's long association with plaintiff over seven different projects, Aldairi must have been aware that plaintiff did none of the work. However, Aldairi approved, and the Bank paid, five draws pursuant to facially noncompliant sworn affidavits.

¶ 29    Contrary to the trial court's ruling, Aldairi's knowledge could not affect plaintiff's duties under the Act. The plain language of section 5 provides that an owner waives the requirement

that a contractor furnish a compliant sworn affidavit only by not requesting it. 770 ILCS 60/5 (West 2008). Therefore, an owner cannot, consistent with section 5, excuse a contractor's duty to provide a compliant sworn affidavit once the owner has requested the affidavit. In other words, there is no correlation between the owner's acceptance of a sworn affidavit and the contractor's right to a lien. Otherwise, courts would effectively be able to read the requirements of section 5 out of the Act.

¶ 30    In *Kiefer v. Reis*, 331 Ill. 38 (1928), cited by plaintiff, the contractor provided the owner with a section 5 statement that was not sworn under oath. *Kiefer*, 331 Ill. at 46-47. However, both the owner and the contractor accepted that the amounts due the subcontractors were accurate. *Kiefer*, 331 Ill. at 47. Accordingly, the owner retained funds sufficient to pay the subcontractors the amounts due as shown on the unsworn statement. *Kiefer*, 331 Ill. at 47. Plaintiff cites *Kiefer* for the proposition that an owner can accept a noncompliant sworn affidavit. However, plaintiff ignores that, even though the owner in *Kiefer* accepted a deficient section 5 affidavit, that acceptance affected only the owner's relationship with the subcontractors. *Kiefer*, 331 Ill. at 47. The issue of whether the deficient affidavit defeated the contractor's lien was not raised.

¶ 31    Later cases interpreting the Act hold that a contractor that furnishes a noncompliant sworn affidavit does not have a valid lien. The plain language of section 5 states that it "shall be the duty" of the contractor to give the owner, upon demand, an affidavit as described in section 5. 770 ILCS 60/5 (West 2008); *Cityline*, 2014 IL App (1st) 130730, ¶ 13. In *Deerfield*, this court held that the contractor was not entitled to a mechanic's lien where it failed to furnish a sworn affidavit that complied with section 5. *Deerfield*, 74 Ill. App. 3d at 386. In *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512 (2009), this court held that the lack of a notary certificate on the section 5 affidavit defeated the contractor's lien. *Weydert*, 395 Ill. App. 3d at 519. The First

District followed *Deerfield* and *Weydert* in *Cityline*, even though the subcontractors had been paid, reasoning that courts cannot look past a contractor's failure to comply with section 5. *Cityline*, 2014 IL App (1st) 130730, ¶ 18 ("[W]e cannot look beyond Cityline's failure to comply with section 5 based upon equitable considerations such as whether the Owners were prejudiced by the lack of a sworn contractor's statement."). Accordingly, we agree with the trial court that plaintiff was not entitled to recover on its lien, but for the reason that plaintiff's failure to comply with section 5 defeated the lien. We may affirm for any reason supported by the record regardless of the basis relied upon by the trial court. *Goldberg v. Michael*, 328 Ill. App. 3d 593, 597 (2002). Having determined that plaintiff was not entitled to a mechanic's lien, we have no reason to address the issue of the Bank's setoff. We next address the issues relating to Dukane.

¶ 32    Whether the Trial Court Correctly Found in Dukane's Favor and Against Plaintiff

¶ 33    Plaintiff contends that the trial court (1) incorrectly assessed the amount of damages on Dukane's breach-of-contract action against plaintiff; (2) incorrectly ruled that plaintiff was not entitled to a setoff against any amount due to Dukane; and (3) improperly denied plaintiff the right to present rebuttal testimony in support of its right to a setoff.

¶ 34    Plaintiff filed a claim against Dukane for breach of contract, alleging numerous deficiencies in Dukane's prefabricated concrete slabs. Dukane, in turn, filed a breach-of-contract action against plaintiff, alleging a balance due of $70,545 under the contract. Plaintiff then pleaded its alleged damages as a setoff against any amount found to be due to Dukane. However, in closing argument, plaintiff conceded that it owed Dukane $50,395, which was Dukane's demand less contested extras. The trial court found that Dukane was due a minimum of $50,395; that Dukane was not entitled to the disputed extras of $10,150; and that plaintiff had not proved its damages for repairing Dukane's defective work.

¶ 35    Regarding Dukane's breach-of-contract claim, plaintiff argues that Dukane did not substantially complete its contract with plaintiff in a workmanlike manner and should not have been awarded any damages.    The elements of a breach-of-contract action are: (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff.    *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 24.    The general rule in construction contract cases is that a party is held to a duty of substantial performance in a workmanlike manner and that the failure to perform in a workmanlike manner constitutes a breach of contract.    *Meyers v. Woods*, 374 Ill. App. 3d 440, 453 (2007).    We will not disturb the trial court's determination unless it was against the manifest weight of the evidence.    *Meyers*, 374 Ill. App. 3d at 453.

¶ 36    The trial court found that Dukane was entitled to recover $50,395 as the balance due on its contract with plaintiff, pursuant to plaintiff's concession in closing argument.    On appeal, plaintiff maintains that a party cannot stipulate to damages in closing argument, citing *Williams v. Cahill*, 258 Ill. App. 3d 822 (1994).    However, *Williams* was a personal injury case in which the plaintiff suggested to the jury in closing argument an amount that would reasonably compensate her for economic and noneconomic damages.    *Williams*, 258 Ill. App. 3d at 824.    In *Williams*, the plaintiff's suggestion as to damages was not a judicial admission but merely an opinion. *Williams*, 258 Ill. App. 3d at 826.    Here, plaintiff's stipulation was that it owed Dukane a sum of money as payment on the contract price.    The sum of $50,395 was calculated by subtracting the disputed extras from the full amount Dukane sought.    The trial court found that Dukane was not entitled to the disputed extras, because they represented charges made after the controversy arose. By arguing on appeal that Dukane was due nothing on its contract, plaintiff is changing its theory. Plaintiff submitted to the trial court that it owed Dukane $50,395, and it cannot change its theory

on review. See *Hall v. Humphrey-Lake Corp.*, 29 Ill. App. 3d 956, 962 (1975) (the theory upon which a case is tried cannot be changed on appeal). Consequently, the trial court's finding that plaintiff owed Dukane $50,395 was not against the manifest weight of the evidence.

¶ 37    Regarding its claim for a setoff, plaintiff argues that the trial court erred in finding that it failed to prove its cost to repair Dukane's defective workmanship. Damages need not be proven with mathematical certainty, and a plaintiff need only present evidence that allows the court to compute damages within a fair degree of probability. *Doornbos Heating & Air Conditioning, Inc. v. Schlenker*, 403 Ill. App. 3d 468, 487 (2010). The issue of damages is a question of fact, and we will not reverse the trial court's determination unless it was against the manifest weight of the evidence. *Doornbos*, 403 Ill. App. 3d at 485.

¶ 38    The trial court found Saif to be not credible, because of his demeanor while testifying and also because he kept no records to substantiate plaintiff's damages claims. Saif admitted during Dukane's cross-examination that plaintiff does not keep accurate invoices or records of what jobs the subcontractors do. Saif also admitted that plaintiff does not have contracts or lien waivers that document subcontractors' work. Saif further admitted that "lots of people do the same work," and he had a hard time keeping track of who performed specific jobs.

¶ 39    Plaintiff argues that its claim of $240,000 to correct Dukane's deficiencies is supported by an itemized invoice, which was the second page of plaintiff's exhibit number 18; Gleason's testimony; Saif's testimony; and canceled checks, which were part of plaintiff's exhibit number 32A. However, the documents cannot be reconciled. The itemized invoice totaled $240,000 for "framing and material of 8 town house units," but it did not break down the number by listing the subcontractors that furnished the labor and materials. Plaintiff's exhibit 40, entitled "Dukane Repairs," listed the subcontractors, the checks paid to them, and the dates they were paid. Exhibit

40 totaled repairs at $228,351.30. While the itemized invoice listed materials at $104,000, exhibit 40 listed materials at $22,462.25. The canceled checks that Saif attributed to Dukane repairs in exhibit 32A were Saif's best effort at reconstructing who was paid what amounts. According to Saif, plaintiff had one checkbook from which it paid everyone on every job, and plaintiff did not keep track of which amounts applied to which job. During Dukane's cross-examination, Saif admitted that none of the figures he supplied on any of the documents were accurate. Gleason submitted to Saif a cost estimate based on the 2009 RS Means guide, which is used in bidding construction jobs, so Gleason's testimony did not reflect plaintiff's actual payments for repairs. Basic contract law requires that the plaintiff prove damages with reasonable certainty and precludes damages based on conjecture or speculation. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 106-07 (2006). The evidence must afford a reasonable basis for the computation of damages. *Razor*, 222 Ill. 2d at 107. Here, the record did not afford the trial court with a reasonable basis upon which it could compute damages. Accordingly, its finding in favor of Dukane and against plaintiff was not against the manifest weight of the evidence.

¶ 40    Plaintiff argues that plaintiff and Dukane agreed to a set fee of $240,000 for the repairs. The trial court found that a set fee was contrary to Awad's opinion that different materials and amounts were needed for each repair. Plaintiff contends that this finding was against the manifest weight of the evidence. However, Awad testified on cross-examination that the material costs would vary from room to room and unit to unit. Moreover, Dukane contested the $240,000 invoice and demanded signed work sheets with labor hours and material invoices for each item. During Dukane's cross-examination, Saif testified that he "thought" he and Dukane had an agreement. It is the trial court's role to assess the credibility of the witnesses, and where findings

of fact are based upon credibility determinations, we will generally defer to the trial court. *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 979-80 (2006). The trial court found Saif to be not credible. Nothing in the record persuades us that this finding was against the manifest weight of the evidence. Accordingly, the trial court did not err in finding in favor of Dukane and against plaintiff on plaintiff's claim.

¶ 41    Plaintiff next contends that the trial court improperly denied it the right to present rebuttal testimony to support its setoff claim against Dukane. During plaintiff's case-in-chief, Dukane elicited testimony pertinent to its counterclaim against plaintiff. Plaintiff then rested but indicated that it would respond to Dukane's counterclaim during rebuttal testimony. Plaintiff called Saif in rebuttal but neglected to address Dukane's case before it released the witness for cross-examination. The Bank cross-examined Saif, but Dukane did not. Plaintiff then attempted to explore the Dukane matter on redirect, but the trial court sustained Dukane's objection that the matter was beyond the scope of cross-examination. Plaintiff's attorney stated, "All right. So we're done." It is within the trial court's discretion whether to allow rebuttal testimony, and the court's determination will not be disturbed absent a clear abuse of that discretion. *People v. Dresher*, 364 Ill. App. 3d 847, 862 (2006). Plaintiff has not alleged prejudice as a result of the trial court's ruling, and we are unable to review the issue because plaintiff did not preserve it by making an offer of proof. The key to preserving an error in the exclusion of evidence is an adequate offer of proof as to the nature of the proffered evidence. *Turgeon v. Commonwealth Edison Co.*, 258 Ill. App. 3d 234, 240 (1994). The failure to make an adequate offer of proof forfeits the issue on appeal. *Turgeon*, 258 Ill. App. 3d at 241.

¶ 42    Plaintiff's final contention is that the cumulative errors denied it a fair trial.   Because we have determined that the trial court committed no error, this argument is without merit. Accordingly, we affirm the judgment of the circuit court of Du Page County.

¶ 43    Affirmed.