2021 IL App (1st) 191805-U
Nos. 1-19-1805 & 1-19-2097 (cons.)

SECOND DIVISION
May 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| DASHA DAVIS, Individually and as Representative of the ESTATE OF GARY J. SMITH, deceased, and RAMAR BROWN, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs, | ) ) | No. 15 L 4799 |
| v. | ) ) | |
| CITY OF CHICAGO, a municipal corporation, and UNKNOWN OFFICERS OF THE CHICAGO POLICE DEPARTMENT, | ) ) ) ) | The Honorable Thomas More Donnelly, Judge Presiding. |
| Defendants | ) ) | |
| (Dasha Davis, as Representative of the Estate of Gary J. Smith, Plaintiff-Appellee; City of Chicago, Defendant-Appellant). | ) ) ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held:* Although the plaintiff's counsel improperly argued that the jury's answer to a special interrogatory was to be dictated by the jury's verdict, the trial court did not abuse its discretion in determining that it did not warrant a new trial under the circumstances in which the argument was made. The defendant's contention that the trial court erred in refusing to give IPI 5.01 with respect to witnesses the plaintiff failed to call did not warrant reversal, because the defendant did not provide a sufficient record on appeal to conduct meaningful review. The defendant's contention that the trial court erred in giving IPI 5.01 with respect to missing dashcam videos was waived due to the defendant's failure to object to the giving of the

instruction. Finally, even if the trial court erred in giving a jury instruction defining willful and wanton conduct to include reckless conduct, such an error did not warrant reversal.

¶ 2       Defendant, City of Chicago, appeals from the judgment entered in favor of plaintiff, Dasha Davis, as Representative of the Estate of Gary J. Smith, following a jury trial on her wrongful death and survival claims arising out of the shooting death of her father, Gary J. Smith, by a Chicago police officer. On appeal, defendant argues that (1) it was denied a fair trial when plaintiff's counsel improperly linked the special interrogatory to the general verdict during closing arguments; (2) the trial court refused defendant's request that Illinois Pattern Instruction ("IPI") 5.01 be given based on plaintiff's failure to call certain family members as witnesses at trial; (3) the trial court erred in giving IPI 5.01 based on defendant's failure to produce certain dashcam videos at trial; and (4) the trial court erred in giving an instruction defining willful and wanton conduct as including reckless conduct. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4       The record on appeal in this matter is quite voluminous. Accordingly, we recite here only those facts necessary to a general understanding of the procedural background and the evidence presented at trial. Additional facts will be discussed as necessary during our analysis of the issues raised on appeal.

¶ 5       In May 2015, plaintiff[1] filed suit alleging that one or more officers with the Chicago Police Department ("CPD"), without legal justification, shot and killed Smith in the early morning hours of May 11, 2014. The initial complaint included wrongful death and survival claims based on underlying causes of action for battery, assault, and intentional infliction of

---

[1] In addition to Davis in her capacity as representative of Smith's estate, the initial complaint included as plaintiffs Davis in her individual capacity and Ramar Brown, Smith's son. Davis and Brown in their individual capacities were subsequently dismissed as plaintiffs.

emotional distress. A jury trial was conducted on these claims in 2018 but ended in a mistrial after the jury became hopelessly deadlocked.

¶ 6        A second jury trial was conducted from February 26, 2019, through March 21, 2019.

¶ 7        Plaintiff testified first. She testified that although she lived apart from Smith while she was growing up, he would often take her to do things together and to celebrate holidays. In the time before Smith died, she saw him nearly every day and visited him at his home. She testified regarding the negative impact Smith's passing had on her life. She also testified that Smith was right handed.

¶ 8        Sharon Hughes testified that she lives on West Madison in Chicago, near the intersection of West Madison and North Lotus. The view from her second-story apartment faces North Lotus and an AutoZone parking lot on the northwest corner of West Madison and North Lotus. At around 2:20 a.m. on May 11, 2014, Hughes was awoken by noise outside of her apartment. She looked out her window and saw about 20 people shoving and cussing at each other. She called 911 to report the disturbance. During that call, the dispatcher asked Hughes if she saw any weapons in the crowd, and Hughes answered that she did not. She further confirmed during her testimony that she never saw anyone in the crowd point a gun.

¶ 9        When the police arrived, they started to disperse the crowd. As they were doing that, Hughes heard someone say, "He got a gun." She saw a man run through the AutoZone parking lot to North Lotus. Two police officers chased the man: one of the officers went through the AutoZone parking lot, while the other ran from Madison up Lotus. Hughes then heard gunshots and, in response, she dropped to the floor. In total, she heard about five or six gunshots. She did not witness the shooting because she was on the floor. Once the shots stopped, she got up and looked out the window. People were screaming that the man had been shot, and a lot of police,

fire trucks, and ambulances arrived. She never saw a police officer with two guns in his hands or placing a gun in the trunk of a car.

¶ 10        Matthew Williams testified that he lived in an apartment on the northeast corner of West Madison and North Lotus. His front window overlooked Madison, but his back porch overlooked North Lotus towards the AutoZone on the northwest corner of the intersection. At approximately 2:30 a.m. on May 11, 2014, he was watching TV when he heard a commotion outside and then shortly after, he heard gun shots. He looked out his front window and saw a group of people rushing toward Lotus. He then rushed to his back porch to see what was happening on Lotus. When he got there, he observed the group of people he had seen from his front window, police officers, and a man lying on the ground, squirming. Williams did not see a police officer pick up a gun from near the man on the ground, walking around with a gun in each hand, or unloading a gun. Williams did not see the actual shooting.

¶ 11        Retired Sergeant Lance Becvar of the CPD testified that on May 11, 2014, he worked for the CPD as the supervisor of the mobile tech unit. That unit was involved in the maintenance and operations of technology in police cars, including dashcams. Officers in that unit also respond to requests from detectives for the immediate retrieval of dashcam video following an incident.

¶ 12        Becvar explained that dashcams automatically record failsafe video from the time the system is logged on until the time it is logged off. Failsafe video, however, is recorded over approximately every 24 to 48 hours, depending on the memory available and how much that particular vehicle was used. Failsafe video does not include audio.

¶ 13        Event video, on the other hand, begins recording only when the lights on a vehicle are activated, an officer pushes a button on the in-car touchscreen, or an office pushes a button on

their microphone. When an event video is activated, it automatically captures the one minute of failsafe video that preceded the activation. An event video stops only when an officer presses a button on the in-car touchscreen. Audio is included with event video, provided that the microphones are properly synced. Event videos are uploaded either manually by the officers when they return to the station and log off the system, or automatically when the vehicle connects with a CPD hotspot at a station. Officers with the mobile tech unit are able to retrieve event videos from a car's system. After an event video is created, the creating officer is supposed to assign a classification to the video, which determines how long it will be retained by the CPD. Unless labeled under a classification that is retained indefinitely, the video will be retained for a minimum of 90 days, after which time it can be purged.

¶ 14    With respect to dashcam videos related to the shooting of Smith, Becvar testified that the video log for the vehicle used by Officers Serguey Klemens and Jonathan Elarde showed that five event videos were created by that vehicle's dashcam in the hours leading up to Smith's death. He did not know why there was no video created around 2:30 a.m. on May 11, 2014, but testified that an event video should have been triggered if the emergency lights on the vehicle were activated and the system was working properly. He looked for but did not find any help desk tickets related to the dashcam in that vehicle. He also testified that if repairs had been performed, there would have been documentation to that effect.

¶ 15    With respect to the dashcam in the vehicle operated by Officers Martina Makropoulos and Brandon Dougherty, Becvar testified that the video log showed that an event video started when the lights on the vehicle were activated at approximately 2:29:18 a.m. The video was then stopped when a stop button was pressed at 2:30:56 a.m. Becvar agreed that if it had been

requested in time, the passive video that followed the stopping of the event video could have been retrieved.

¶ 16     Moving on to the vehicle driven by Officers Daniel Trakes and Melvin Mendez on May 11, 2014, Becvar testified that an event video was created and captured from 2:29:54 a.m. through 3:08:50 a.m. It was then later uploaded at 5:03:56 a.m. A DVD was burned of the video at 5:20:14 a.m. by the records division of the CPD. Becvar did not know where the DVDs were, as he was not involved in that process. The video log reflected that the video was given a "default" classification and, thus, was subject to the 90-day retention period. Accordingly, the video was purged from the system on August 11, 2014.

¶ 17     Finally, with respect to the dashcam in the vehicle operated by Officers Jaime Ortiz and Javier Saez that night, the video log demonstrated that an event video was created starting at 2:34:13 but did not show when it ended. It was purged from the system on September 18, 2014.

¶ 18     On cross-examination, Becvar testified that it would not be uncommon for a dashcam to work properly during part of a shift and then stop working. Dashcams are exposed to extreme temperatures and vibrations.

¶ 19     Krystal Ellis, Smith's fiancé, testified next. She testified that on the night of May 10, 2014, she and Smith attended a birthday party for Smith's aunt at In the Cut ("ITC") barbershop on West Madison. Around 2:00 a.m. on May 11, 2014, everyone started to leave the party. Ellis's vehicle was parked across Madison on North Lotus. She and Smith began to walk towards her vehicle when he turned around and went back to talk to some family members. She continued to her vehicle, went to the driver's side, and sat in the driver's seat with the door open to change her shoes. Smith then returned to the vehicle and stood on the passenger's side with the door open while talking to Ellis.

¶ 20    Meanwhile, there was a group of approximately 10 to 20 people arguing on the sidewalk by TJ's Barbershop, which was located on the southside of Madison, west of ITC. Someone called Smith over, because he was known to be a peacemaker. Ellis walked to the entrance to the AutoZone parking lot on Madison, which was across the street from TJ's. From there, she saw Smith stand in the middle of group of people with his arms extended in an attempt to break up the argument.

¶ 21    A few minutes later, police arrived. One of the unmarked police cars drove around a CTA bus that was at the intersection of Madison and Lotus and into the crowd in front of TJ's, causing the people in the crowd to jump out of the way. Smith jogged back across Madison towards where Ellis was standing. When he reached her, she "fussed at" him and told him, "Let's go." Smith did not have anything in his hand at that time. They then jogged together toward the northwest corner of Madison and Lotus. Right before they reached the corner, Ellis saw two police officers running toward them with their guns out. One of those officers was Arkadiusz Pachnik. She later testified that she saw three to five officers running towards them.

¶ 22    Pachnik ran toward Smith and said, "Hey." Another officer pushed Ellis out of the way. Smith stopped in his tracks and put his hands up about 6-12" over his head while standing next to the fence surrounding the AutoZone parking lot. Smith did not have anything in his hands when he put them up. The officers ran past Smith. When Ellis got up and faced Smith, she saw Officer Shikema Teague to her right and Pachnik to the right of Teague. Pachnik and Teague had their guns out and pointed at Smith. Then, lots of shots were fired. Ellis was approximately two feet away from Smith at the time of the shooting, but she could not say who fired first or how many shots each officer fired. Later, during various points in her testimony, Ellis testified that she saw three officers with their guns pointed at Smith (Pachnik, Teague, and Elarde), three

to five officers with their guns out, and "a lot" of officers present at the time Smith was shot. When Smith was shot, he fell back against the fence and down onto his left side.

¶ 23    Ellis testified that Smith did not own or carry a gun. At no point that night did Smith have a gun. Ellis did not see the police pick up a gun from Smith's side after he fell to the ground, and she never saw Pachnik walking around with two guns in his hand. Smith was right handed.

¶ 24    On cross-examination, Ellis testified that during questioning by police after the shooting, the police kept pressuring her to say that Smith had a gun. She repeatedly told them that he did not. One of the detectives asked what Smith was reaching for in his pocket, and she told him that he was reaching for a cigarette because she had asked him for one.

¶ 25    Valentina Hoy testified that she lived on the corner of Madison and Lotus. On the morning at issue, she woke up to a crowd of more than 10 people arguing outside of her window, just west of her apartment on Madison. She saw some people in the group shoving and pushing, but no one was throwing punches. Amid the people talking, she heard a man telling the people in the group that they were family, grew up together, and did not need to be fighting. Eventually, the man threw his hands up and ran off across street. Two women were standing in the street and one of them flagged down a passing police car and said that the man who had run off had a gun. The other woman screamed at her, asking, "Why would you say that?" Hoy did not see anybody in the crowd with a gun, and she did not see a gun in the hand of the man who ran across the street.

¶ 26    When the woman flagged down the police, two officers got out and chased after the running man with their guns drawn. When the man reached the northwest corner of Madison and Lotus, he realized the police were behind him. He put his hands up and turned the corner.

He did not have a gun in his hands when he put them up. Once the man and the officers went around the corner, she could not see the man's body, but she could see that his hands were still up. Within seconds, she heard gunshots. She could not see the shooting from where she was, but she heard someone yell, "You killed my friend. He didn't have no gun."

¶ 27    After the shooting, she did not see anybody pick up a gun from the ground, an officer with two guns in his hands, or an officer place a gun in the trunk of a car.

¶ 28    Officer Matthew Dallio of the CPD's Public Safety Information Technology Unit testified next. He testified that on May 11, 2014, he was asked to retrieve some dashcam videos pertaining to Smith's shooting. When he arrived at the detective bureau, he was given a list of three vehicles from which to retrieve videos. From Sergeant Luis Gonzalez's vehicle, he retrieved the failsafe video.

¶ 29    He attempted to remove video from the vehicle operated by Elarde and Klemens, but was unable to do so, because the system was inoperable and did not record a video. When he logged onto the system in that vehicle, the operating system produced error messages indicating that all of the system files were corrupted and nothing was working. In situations like that, the recording equipment would not start, meaning nothing would have been recorded after the system was corrupted and there would be nothing to retrieve. There were no signs that anyone had tampered with the system in Elarde and Klemens' car.

¶ 30    Dallio also reviewed the failsafe video from the vehicle operated by Makropoulos and Dougherty. He did not review the event video from that vehicle. He reviewed the failsafe video with the detectives, and the detectives determined that it showed that Makropoulos and Dougherty arrived at the scene of the shooting after the fact and parked away from the crime

scene. Although Dallio never visited the scene of the shooting, the detectives would tell him if the video was needed for evidentiary purposes.

¶ 31    With respect to the storage of failsafe video, Dallio explained that each time the vehicle is turned on, the dashcam system deletes the oldest stored file and creates a new one in its place. When the system is then turned off, the dashcam system ends the file and pushes it to the back of storage. Accordingly, the more that a vehicle is used and turned off and on, the more failsafe video data that is deleted.

¶ 32    On cross-examination, Dallio testified that dashcam systems are essentially just computers like a person would have at home or in their office. The dashcam system in a police vehicle runs nearly 24 hours per day, 7 days per week, is exposed to extreme heat and cold in the back of the vehicles, and bounces around in the car all day.

¶ 33    The parties stipulated that if called to testify, Sergeant Daniel Durst would testify that he was the supervising officer for Elarde and Klemens on May 10, 2014, and May 11, 2014. At 11:00 p.m. on May 10, 2014, he determined that the dashcam in the vehicle operated by Elarde and Klemens was operable and logged on. During his contacts with Elarde and Klemens prior to the shooting incident, they did not report any problems with their dashcam. Durst knew of no problem with their dashcam on May 11, 2014, and did not create a work order for their dashcam that day or thereafter.

¶ 34    Sergeant Luis Gonzalez of CPD testified that at approximately 2:20 a.m. on May 11, 2014, he responded to a call of battery in progress at 5400 West Madison. When he arrived, Pachnik, Teague, Elarde, and Klemens were already there and sitting in their vehicles. Gonzalez observed people leaving ITC but did not observe any battery in progress. Gonzalez parked his

car and got out to speak with Terrance Stanley, the owner of ITC. At the same time, Pachnik, Teague, Elarde, and Klemens got out of their vehicles and walked to where Gonzalez was.

¶ 35    As he was speaking to Stanley, Gonzalez observed a group of people near TJ's, approximately 200 feet away, arguing but not fighting. He did not observe anyone with a gun, pointing a gun, or people ducking to get out of the way of a gun. He sent Pachnik, Teague, Elarde, and Klemens to disperse the people near TJ's. Elarde and Klemens drove their vehicle westbound around and behind a bus that was stopped facing eastbound near the intersection of Madison and Lotus, so that the front of their vehicle went into the crowd. When they did this, people from the crowd started to disperse, and Gonzalez observed Smith walk and then run northeast toward the corner of Madison and Lotus.

¶ 36    Gonzalez testified that prior to the shooting, no officer came over the radio to report that anyone had a gun. He acknowledged, however, that during the statement he gave on the morning of the shooting, he stated that shortly before the shooting, Elarde had relayed over the radio that someone in the crowd had a gun. He testified that he was mistaken when he made that statement.

¶ 37    As Smith was heading toward the northwest corner of Madison and Lotus, Gonzalez saw Pachnik and Teague get out of their vehicle and run towards Smith. Meanwhile, Elarde was also running after Smith, following the same path Smith had taken across Madison. Gonzalez did not know whether Pachnik, Teague, or Elarde had their guns out while approaching Smith. As Smith was running north on Lotus and facing away from Pachnik, Pachnik grabbed the back of Smith's shirt. In response, Smith shrugged away and turned toward Pachnik. Gonzalez never saw a gun in Smith's hand. At the time Pachnik started shooting, Smith and Pachnik were only about two feet away from each other, but then Pachnik took a couple of steps back as he was

shooting. During this time, Pachnik, Teague, and Smith were standing in a triangle, with Pachnik on the north end of the triangle, Teague standing south of Pachnik, and Smith standing west of the two officers near the fence. Gonzalez did not know where Elarde was at the time the shots were fired. Gonzalez maintained that although his back was to the shooting scene, he observed the shooting because he turned his neck so that he could see.

¶ 38    After the shooting, Gonzalez ran across the street and used his radio to call a "10-1," which means officer needs assistance. When he got to where Smith was, Gonzalez observed a gun lying on the ground next to Smith's body, but he could not recall what part of Smith's body the gun was near. Gonzalez directed Pachnik to pick up the gun with his bare hands because there were people "bum-rushing" the shooting scene. Although he knew that Pachnik turned over the gun to his immediate supervisor, he did not witness that exchange. After Pachnik picked up the gun, Gonzalez told Ellis, "See what he had?" Ellis responded "Yes, I told him to drop it but he wouldn't drop it." Gonzalez did not tell investigators what Ellis said when he gave his statement later that morning. He did not tell anyone about Ellis's statement until three years later when he was deposed for the present lawsuit.

¶ 39    Gonzalez testified that he did not start running when he saw the others running after Smith. He admitted, however, that in his statement after the shooting, he stated several times that he told Stanley to wait and that he would be right back, and then started running after the others and crossed the street before the shooting occurred. He also told investigators that as Teague and Pachnik were approaching Smith, he turned his body towards them and began walking or jogging into the street towards them. Gonzalez admitted that this did not happen and testified that he was mistaken when he made those statements. In addition, Gozalez told investigators that he was "closing in" when he saw Pachnik grab the back of Smith's shirt and

Smith shrug off Pachnik. He told investigators that he was actively running towards the incident when Smith turned towards Pachnik and that he was about 20 to 25 feet away when the shooting occurred. Gonzalez testified that this also was not true and that he was still across the street when Pachnik grabbed Smith's shirt and the shooting occurred. He did not move toward the shooting scene until after the shots were fired. He changed his statement to investigators after he viewed a video from the CTA bus that showed when he actually crossed the street.

¶ 40     The video deposition of Sergeant Floyd Goldsmith of the CPD was played for the jury. During that deposition, Goldsmith testified that on May 11, 2014, Pachnik and Teague were members of the tactical team he supervised. At some point on the morning of May 11, 2014, he responded to the shooting of Smith. While there, Goldsmith learned that a gun had been recovered following the shooting. Goldsmith could not recall the details of the conversation he had with Pachnik regarding the recovery of the weapon. Goldsmith took the recovered gun from Pachnik and placed it in the trunk of his car. The gun was not placed in any type of evidence bag before he put it in the trunk. At some point the gun was removed from the trunk of his vehicle, but he could not recall the details of that transfer.

¶ 41     The deposition of Officer Jaime Ortiz of the CPD was read into the record. He testified that on the morning of May 11, 2014, he was working with his partner, Officer Javier Saez. At approximately 2:30 a.m., they responded to a call of shots fired in the area of Madison and Lotus. They immediately responded from approximately two and a half blocks away, resulting in them being one of the first cars to arrive on the scene. They parked facing north on Lotus, near the corner of Lotus and Madison. When he got out of the car, he did not see any officer kick a gun on the ground or pick up a gun off the ground. While he was at the scene, he never

heard any of the officers say that the man who was shot had a gun. He did not see any citizens threaten or approach any officers.

¶ 42    Joseph Wohrstein, a latent print examiner with the Illinois State Police, testified that he did not find any fingerprints suitable for comparison on the gun, magazine, or bullets recovered from the shooting.

¶ 43    Officer Paul Presnell, a forensic investigator with the CPD, testified that he was called to the scene of Smith's shooting on approximately 3:40 a.m. on May 11, 2014. While at the scene, he was told that a gun had been recovered and that it was in the trunk of an unmarked police car. Presnell photographed the gun and its magazine in the trunk of the vehicle and then recovered them by placing them in a gun box and locking the box in his van. After completing his work at the scene, Presnell returned to the police station to photograph Pachnik and recover Pachnik's weapon. Pachnik's gun and magazine had a capacity of 16 bullets. At the time Presnell recovered Pachnik's gun, there were eight bullets in the magazine and one in the chamber. The purpose of recovering Pachnik's gun was for testing. Presnell was not asked to recover Teague's or Elarde's guns for testing.

¶ 44    Presnell testified that he recovered seven shell casings from the scene of the shooting. He also testified that one bullet that was removed from Smith at the hospital and four by the medical examiner during the autopsy.

¶ 45    Sergeant Bryan Holy of the CPD testified next. Holy worked as a sergeant in the detective bureau, which meant that he supervised detectives but was not a detective himself. At some point in the days following the shooting, he became the supervising sergeant for the investigation of the shooting. Holy testified that the medical examiner's report indicated that Smith sustained four through-and-through bullet wounds. He also testified that he was aware

that five bullets were recovered from Smith's body. Pachnik's gun was missing seven bullets. He never ordered testing on Teague's or Elarde's gun or inquired of them regarding whether they fired their guns.

¶ 46        Holy acknowledged that dashcam video from the vehicle operated by Makropoulos and Dougherty showed them arriving at the scene shortly after the shooting occurred and parking about 20 to 30 feet away from where Smith was laying before the video was stopped by one of the officers. He also acknowledged that the dashcam video from the vehicle operated by Elarde and Klemens, if it existed, might have shown whether Smith had a gun while in the crowd near TJ's.

¶ 47        The parties stipulated that if Brian Zentek, a forensic scientist with the Illinois State Police, were to testify, he would testify that based on his examination and testing, the seven shell casings recovered from the scene and the five bullets recovered from Smith's body were fired by Pachnik's gun.

¶ 48        Pachnik testified next. He testified that on the morning of May 11, 2014, he responded to a call of a battery in progress. He and Teague drove east on Madison past ITC. He saw people outside of ITC, but he did not see any fights taking place. He turned around and parked in the median of Madison facing westbound. He and Teague did not immediately get out of the car, and as they were sitting in their vehicle, Elarde and Klemens pulled up and parked behind them. As they were sitting in the car, a second call came over the radio, this time for a man with a gun in the area. Teague responded on the radio that they were at the scene. Packnik acknowledged that in his recorded statement to investigators and during his deposition, he stated that he and Teague were already out of their vehicle and dispersing the crowd when the call for a man with a gun came in.

¶ 49    Once Gonzalez arrived on the scene, Pachnik, Teague, Elarde, and Klemens exited their vehicles to help Gonzalez disperse the crowd near ITC. No one was fighting or doing anything illegal. As the crowd was thinning out, a woman ran over to another woman in the area of ITC and said, "That guy's got a gun. They're about to start shooting." Meanwhile, the crowd in front of TJ's started to build, and Gonzalez directed Pachnik, Teague, Elarde, and Klemens to go disperse that crowd. Pachnik acknowledged that he did not tell the investigator about the woman who reported seeing a gun, but testified that he did tell detectives.

¶ 50    As he and Teague were in the eastbound lanes of Madison walking back to their vehicle, Teague stopped, looked west toward the bus, and told him that the man with the red plaid shirt had the gun in front of TJ's. He understood this to mean that Teague saw the man with the gun. They continued to walk to their car. By the time they reached the driver's side of their car, Elarde and Klemens had driven their vehicle around the back of the bus into the crowd in front of TJ's, and Pachnik saw people running from behind the bus. When he reached the driver's side of the vehicle, he looked west, trying to find the person Teague pointed out. He then started to run west toward the bus when Teague called his name. He turned around, and Teague told him it was the man wearing the red plaid shirt and pointed at Smith, who was running across Madison. Pachnik believed that Smith was running because he had a gun. Pachnik threw his car keys to Teague and started to run northwest toward Smith and the northwest corner of Madison and Lotus.

¶ 51    Pachnik acknowledged that he had previously testified that he and Teague might have been on the sidewalk or in the street when she told him that she saw a man with a gun, but he explained that after he saw the video from the CTA bus, he realized that they were in the eastbound lanes of Madison. He also acknowledged that the video showed that he and Teague

walked all the way to their vehicle and that he did not begin to show a sense of urgency in his movements until after he reached their car. At no point did he see anyone near TJ's fighting, pointing a gun, ducking, or in possession of a gun.

¶ 52    When Pachnik first saw Smith, Smith was jogging across Madison toward the north sidewalk of Madison by the AutoZone parking lot. Pachnik could not see Smith's left hand moving as he ran across Madison, so he assumed that it was at his left side. In a video from one of the police observation devices ("POD") in the area, Pachnik identified Smith jogging across the street and testified that Smith tucked his left hand up by his waistband. Pachnik did not, however, see a gun in Smith's hand at this point.

¶ 53    Once Smith reached the sidewalk on the north side of Madison, he began to run faster. At this point, Smith and Pachnik were running toward each other on the sidewalk. Pachnik had his gun out and pointed at Smith. Pachnik yelled, "Police! Let me see your hands!" twice, but Smith did not comply and kept running toward Pachnik. The two met just west of Lotus, and Pachnik pushed Smith in his right shoulder and up against the fence surrounding AutoZone, but Smith was able to get between Pachnik and the fence. Smith turned left (north) onto Lotus ahead of Pachnik.

¶ 54    As they were both running, Pachnik grabbed the back of Smith's collar with his left hand and tried to pull him back. In response, Smith leaned forward. Pachnik saw Smith's left arm moving toward his left side and yelled, "Drop the gun, drop the gun!" Because Pachnik was standing behind and to the right of Smith, he could not see the left side of Smith's body and could not see a gun, but based on Teague's statements and his own observations, Pachnik believed Smith had a gun.

¶ 55        Smith then spun to his left.  To gain distance from Smith, Pachnik let go of Smith's collar, pushed Smith away, extended his arm, and took a couple steps back.  Both men were spinning and moving at this point, and as Smith was turning, Pachnik saw a gun in Smith's left hand.  The gun was pointed toward the AutoZone parking lot but, as Smith turned, the gun also spun and pointed back towards Madison and then towards Pachnik.  As soon as Pachnik saw the gun in Smith's hand, he started firing his weapon from his hip.  He did not know exactly where Smith's gun was pointed at the time he started firing.  Although he started firing when Smith's gun was not pointed at him, Smith continued to spin, such that the gun was eventually pointed at him.  Both he and Smith were moving as he was firing.

¶ 56        As Pachnik shot, Smith fell to the ground.  At some point, Pachnik's focus shifted from the gun in Smith's hand to Smith's person, and he continued to shoot until he saw Smith's gun on the ground.  He did not know whether Smith had fallen to the ground by that point.  Pachnik acknowledged that he initially told investigators that he continued to shoot Smith as Smith fell to the ground and after he no longer saw a gun in Smith's possession.   He later called the investigator to change his statement to reflect that he did not mean that he did not see a gun in Smith's hand, but instead meant that he took his eyes off the gun and instead focused on Smith's person.

¶ 57        Although he did not know where exactly Teague was at the time of the shooting, he knew she was close.  He also did not know where Elarde was, but he acknowledged that video showed Elarde running toward the northwest corner of Madison and Lotus seconds before the shooting.  Teague and Elarde did not fire their weapon.

¶ 58        After Pachnik stopped shooting, Smith was on the ground with his back against the fence.  Pachnik ordered Smith to put his hands up, and Smith complied.  Smith's gun was on the ground

next to his right thigh. Pachnik walked over and kicked the gun away from Smith. Pachnik then picked up the gun with his bare hands because there were people running in his direction. He identified a dashcam video that depicted him after the shooting carrying his gun in one hand and the gun he recovered from Smith in his other. He identified a second video in which he is shown unloading the gun recovered from Smith. Ultimately, Pachnik gave the recovered gun to Goldsmith, who then put it in the trunk of an unmarked, dark-colored Crown Victoria.

¶ 59    The video deposition of Officer Jonathan Elarde was played. During that deposition, Elarde could not recall many details of May 11, 2014, because he sometimes "blocks things out." He did testify, however, that prior to the shooting, he and Klemens drove their vehicle west on Madison around the CTA bus and towards the crowd near TJ's. When they pulled up, the crowd scattered. At that time, Elarde did not see anyone with a gun. At some point, he started chasing Smith in a northeast direction across Madison. He believed that he chased Smith because someone said that he had a gun. He could not remember whether he had his gun out while he was chasing Smith, whether he told Smith to stop, whether he heard anyone else yell stop, or whether he saw Pachnik running across Madison.

¶ 60    Smith turned onto Lotus. Once Elarde got to and turned the corner of Lotus and Madison, he saw Smith's body on the ground. He could not recall whether Smith was moving, Pachnik was nearby, or anyone else was nearby. He did not recall seeing a gun near Smith, Pachnik kick a gun, Pachnik pick up a gun, or Pachnik in possession of a gun other than his service weapon.

¶ 61    Elarde testified that he did not know why the dashcam in his vehicle did not create an event video when he activated his vehicle's light bar when he drove around the bus.

¶ 62       Plaintiff next played the video deposition of Officer Shikema Teague. In that deposition, Teague testified that on the morning of May 11, 2014, she and Pachnik responded to a call of a battery in progress in the 5400-block of Madison. As they drove east on Madison, the observed two large crowds. The first was west of Lotus on the south sidewalk near TJ's and consisted of approximately 20 people. She did not see any weapons or any sort of physical altercation taking place in that group as they drove past. The second crowd was on the south sidewalk near ITC. There, Teague observed what appeared to be a party going on, with DJ equipment and people inside the barbershop. There were also people outside the barbershop. There was no indication of any type of altercation occurring at this location.

¶ 63       Gonzalez was already at the location and talking to the owner of ITC when Pachnik and Teague arrived. She and Pachnik performed a U-turn and parked facing west on Madison. They then received a call for a man with a gun at the location. She responded to dispatch by saying they were at the reported location and did not see anyone with a gun. She then got out of the vehicle and went over to Gonzalez.

¶ 64       A woman who was standing on the southeast corner of Madison and Lotus told her that there was a guy in the crowd near TJ's who had a gun. Teague relayed to Pachnik what the woman told her, and they headed to their car. When they reached their vehicle, Teague looked west and saw Smith with his left arm extended and a gun in his hand. She told Pachnik what she saw. At the same time, Elarde drove his vehicle past them. Pachnik started running toward the crowd. Teague called out to him, indicated that Smith was across the street and wearing a red plaid shirt. Pachnik stopped, tossed the car keys back to her, and started running northwest toward the corner of Lotus and Madison with his gun out. Smith was walking briskly across

Madison and then started to jog and then run when he got to the sidewalk on the north side of Madison. She started running on an angle in an attempt to cut off Smith.

¶ 65        Smith turned onto Lotus and got past Pachnik. Pachnik grabbed the back of Smith's collar with his left hand and tried to pull Smith down. Smith buckled at the knees a little but did not fall. Pachnik started shooting before she reached them. She did not hear Pachnik or Smith say anything before the shooting started. She did not see Smith reach for a gun as he was shot. Smith had his back to a fence and when he was shot, he fell back against it and slid down to the ground into a sitting position and then into a laying position on his back. She ran around a utility box to Pachnik's right. She did not see a gun on Smith when he was shot and did not see a gun after that.

¶ 66        Javony Crawford testified that on May 11, 2014, she lived on the corner of Madison and Lotus. In the early hours of that morning, she woke up to a commotion outside her window. She went to the window and saw police lined up outside and a lot of angry people saying, "They shot him for no reason. He didn't have anything." She did not see the shooting.

¶ 67        Gary Rini, an independent forensic science consultant, testified as an expert for plaintiff. He opined that the CPD exhibited investigative bias, did not properly preserve the shooting scene and evidence, and did not create a proper chain of custody for the gun allegedly recovered from Smith. He also criticized the CPD for failing to test Teague's and Elarde's guns to learn whether they were fired, recover Pachnik's service weapon sooner, canvas for eyewitnesses, and download and view the dashcam videos of all dashcam-equipped police vehicles that responded to the scene. With respect to specific dashcam videos, Rini testified that the sudden failure of the Elarde/Klemens camera, Dallio's determination that the Makropoulos/Dougherty video was not significant, and the failure to retain the videos from the Trakes/Mendez and Saez/Ortiz cameras

were all "red flags." These videos might have contained relevant footage to help determine the events leading up to and following the shooting, as the Elarde/Klemens video might have shown whether anyone in the crowd in front of TJ's had a gun, the Makropoulos/Dougherty video showed Pachnik walking after the shooting, the Trakes/Mendez video was parked at the northwest corner of Madison and Lotus following the shooting, and the Saez/Ortiz vehicle was parked facing north on Lotus next to where Smith was laying.

¶ 68        Rini testified that the medical examiner's report concluded that Smith sustained four perforating, *i.e.*, through and through, bullet wounds and four penetrating, *i.e.*, the bullet did not exit, bullet wounds. In addition, the hospital removed another bullet from Smith's body that was not accounted for in the medical examiner's report. In total, Smith sustained nine gunshot wounds. Seven shell casings were recovered from the scene and the location where they were recovered (northeast of Smith's body) was consistent with Pachnik having run after and past Smith.

¶ 69        Rini also testified to what he believed was the most probable sequence of Smith's wounds. He opined that the first shot to strike Smith was to the inside of his left arm. Rini reasoned that because Pachnik testified that he aimed for Smith's center mass, Smith must have been facing Pachnik at the time Pachnik started firing. Accordingly, because the wound to Smith's left arm would have been the one closest to facing Pachnik, Rini concluded that must have been the first wound sustained by Smith. He also opined that the wound to Smith's left arm was consistent with his hands being in the air and inconsistent with holding a gun at his side. He testified that Smith's arm must have been up, because the bullet could not have struck in that location if his arm was straight down and tucked against his body.

¶ 70 Rini testified that after being shot in his left arm, Smith sustained a grouping of gunshots to his left side, suggesting that Smith's body was rotating to the right. According to Rini, after being struck in the left arm, Smith would have brought his left arm down toward the center of his body, causing his left shoulder to lower and his body to twist from the left to the right. This movement would have exposed Smith's left side to Pachnik. Smith was then shot three times in the left side, but Rini could not discern the order of those three shots. The shots to Smith's left side would have been followed by two shots to his back as Smith continued to rotate to the right. One of those shots was to Smith's left lower back, and the trajectory of that bullet indicated that the gun was fired downward. The next shot in the "logical" sequence, Rini opined, was to Smith's lower right back. The final shot was to Smith's right side.

¶ 71 With respect to Pachnik's use of force, Rini opined that Pachnik based his belief that Smith had a gun on Teague's statement that Smith had a gun. Without seeing a gun firsthand, Pachnik was not justified in his use of deadly force. Moreover, Smith's mere possession of a gun, without pointing it at Pachnik, did not justify the use of deadly force. Because Rini's review of the evidence suggested that Smith had his hands in the air, Rini concluded that Pachnik's use of deadly force was not justified. In fact, Rini testified that it was his opinion that Pachnik acted recklessly and with utter indifference to or conscious disregard for Smith's safety when he pursued Smith alone based on the assumption that Smith had a gun.

¶ 72 On cross-examination, Rini acknowledged that Pachnik testified that he actually observed a gun in Smith's hand, Smith did not obey commands to show his hands and drop the gun, and Smith spun quickly toward him with the gun in his hand. According to Rini, Pachnik should have waited to fire his gun until Smith "actually was in position to fire the gun at him" and Pachnik knew for certain that his life was in imminent danger. In addition, Rini testified that

Pachnik's claim that he saw Smith with a gun was not supported by the facts of the case, namely, Teague's, Ellis's, and Hoy's testimony that they did not see Smith with a gun.

¶ 73        Rini agreed that if a person was standing still with his hands up, like Ellis claimed Smith was, an officer who was standing three feet away and not moving should hit center mass. A person who is moving, however, would be much harder to hit in center mass. Rini admitted that he had no idea how Smith was moving his body at the time he was shot, but agreed that there was significant movement of Smith's body.

¶ 74        Rini also acknowledged on cross-examination that none of the dashcam videos related to this case would have shown the shooting.

¶ 75        The deposition of Detective Marina Makropoulos was read into evidence. In it, she testified that on May 11, 2014, she was a patrol officer with the CPD. In the early morning hours of that day, she and her partner, Brandon Dougherty, responded to a "10-1" call over the radio. A "10-1" call means that an officer needs assistance. She and Dougherty arrived on the scene approximately one minute after the shooting. They parked facing north at the corner of Madison and Lotus. The headlights of their vehicle illuminated the northwest corner of Madison and Lotus as they pulled up. In addition, their dashcam was pointed directly at the shooting scene as they arrived. As they arrived, one of them turned off the dashcam, but she could not recall whether it was her or Dougherty.

¶ 76        Plaintiff then rested.

¶ 77        Defendant first called Teague to testify live. She testified that in the early morning hours of May 11, 2014, she and Pachnik responded to a call of a battery in progress in the 5400-block of West Madison. They drove east on Madison, past TJ's, where she saw about 10 people standing on the sidewalk. They continued east and saw a larger crowd in front of ITC. They

slowed as they passed and then did a U-turn and parked in the median of Madison facing west. While they were sitting in their parked vehicle, a call of a person with a gun came over the radio. Teague responded that they were sitting at the location and did not see anyone with a gun.

¶ 78     Teague then got out of the vehicle and joined Gonzalez where he was talking to the owner of ITC on the sidewalk. Gonzalez told her he had the situation under control and to disperse the crowds. Teague started walking west on the south sidewalk to disperse the people standing along it. As she was doing this, a woman told Teague, "You guys are messing with us, but they're getting ready to start shooting down there." The woman was referring to the crowd near TJ's. Teague relayed this information to Pachnik while they were on the sidewalk, starting to walk back to their vehicle. She could be heard on Gonzalez's dashcam telling Pachnik, "Something's going down there with the gun."

¶ 79     As she and Pachnik walked to their vehicle, she looked west on Madison to see what was happening. She saw Smith, wearing a red plaid shirt and red baseball cap, in a "bladed stance" in the south bike lane of Madison with his left arm fully extended and pointing a gun at the people on the sidewalk near TJ's. People responded by ducking to get out of the way. Teague told Pachnik that there was a man with a red plaid shirt with a gun and that he pointed a gun at people on the sidewalk. Although the quality was such that the gun could not be seen, Teague identified a video that she testified showed Smith extending his left arm toward the crowd near TJ's and people ducking and fleeing.

¶ 80     She and Pachnik continued to their vehicle. She was not running at this point, because she wanted to watch where Smith went. Once she and Pachnik reached their car, Pachnik began to run west. He only went a few steps before she called his name and told him the guy in the red plaid shirt was now across the street. She had seen Smith run north across Madison to the north

sidewalk of Madison and then run east. As Smith was running north across Madison, Teague could see the gun was along his left side because his left arm came up a little as he was running. Once he started running east on Madison, Smith brought the gun up to his left waist area. Pachnik tossed the keys to their vehicle to Teague and ran towards Smith. Teague continued to watch until Pachnik met up with Smith.

¶ 81    Once Smith and Pachnik met at the northwest corner of Madison and Lotus, Smith got past Pachnik and ran around the corner onto Lotus. At that point, she began to run toward them. Pachnik had his gun out and in his right hand. He used his left to grab the back of Smith's collar. When he did this, Smith kind of lost his balance or his knees buckled, but he did not fall. Pachnik and Smith were still moving and she saw Smith's body start to turn, but she could not see which direction he turned or see him complete the turn, because her view became blocked by a People's Gas infrastructure sign. She was unable to see Smith's left hand before her view became blocked.

¶ 82    At the time the shooting started, Teague was running along the curb of North Lotus. She did not see the first part of the shooting because of the sign, but she drew her gun when she heard the shots. When she heard the first shots, she did not know who shot first, whether it was Pachnik or Smith. Once she got past the People's Gas sign and was standing to the north of Pachnik, she saw that it was Pachnik shooting. Smith fell backwards into the fence, slid down into a sitting position, and then laid down. Teague then saw a black handgun on the ground close to Smith's body. Pachnik kicked the gun away from Smith and then picked it up with his left hand.

¶ 83    Teague did not fire her weapon.

¶ 84    On cross-examination, Teague testified that she did not see any physical contact between Pachnik and Smith while they were on Madison. She did not see Pachnik push Smith by the shoulder. She also testified that she never heard Pachnik identify himself as police, yell stop or freeze, tell Smith to drop the gun or show his hands, or say anything else at all before he started shooting.

¶ 85    Ronald O'Keefe, a paramedic with the Chicago Fire Department, testified that he responded to the scene to provide emergency medical care to Smith following the shooting. After Smith was loaded into an ambulance and while O'Keefe was working on Smith, an unidentified police officer came to the side door of the ambulance. The officer asked Smith where he got the gun, and Smith responded that someone gave it to him.

¶ 86    Elarde testified next. He testified that he drove his vehicle around the back of the bus and toward the crowd near TJ's because Gonzalez told them to disburse the crowds. After he drove the car around, he got out of the car and heard people yelling and pointing, "He's got a gun. He's got a gun, the guy in the red hat." Elarde then ran northeast behind the bus, chasing Smith. Once Smith turned north onto Lotus, Elarde could no longer see him. He then heard gunshots. He was 40 to 60 yards away on Madison at that point. As a result, he did not personally see the shooting. We he turned the corner onto Lotus, he saw Pachnik walking southbound on Lotus and he saw Smith on the ground. He did not see Pachnik kick or pick up a gun. Elarde denied ever yelling "hey" at Smith, pushing a woman before the shooting, or firing his gun at Smith.

¶ 87    On cross-examination, Elarde testified that prior to pulling his vehicle around the bus, he never saw anyone with a gun or heard anyone say that someone had a gun. After he pulled his car around the bus, he did not see anyone with a gun. He did not see a gun in Smith's hand or in his waistband. He also clarified that it was one woman yelling that someone had a gun when he

pulled around the bus and towards the crowd. He testified that he never heard Pachnik or anyone else yell "stop," and he never heard Pachnik yell "drop the gun" or anything similar. He did not remember seeing Pachnik push Smith up against the fence while on Madison. He also did not remember whether he took his gun out while he was chasing Smith.

¶ 88    Christopher Regalado testified that he was currently employed as a police officer with the CPD, but on May 11, 2014, he was a bus driver with the CTA. In the early morning hours of that day, he was driving his bus eastbound on Madison. As he approached the intersection of Madison and Lotus, he observed a crowd of approximately 30 to 40 people in the right (south) lane of eastbound Madison. The crowd of people appeared to be agitated and arguing, but not throwing punches. He observed a man in a red sweater with a white stripe across it, who appeared to be the main agitator in the group. Other people appeared to be trying to hold him back from getting at someone. He did not see the man in the red shirt or anyone else in the crowd with a gun. Because of these people, he had to move the bus into the left lane. The light at Lotus turned red, and he stopped at the intersection in the left lane to pick up a waiting passenger.

¶ 89    As he was stopped, he watched the crowd in the side mirrors of the bus. A large group of the crowd started to move behind the bus. He looked ahead and saw a police car driving toward the bus, pass to the left of the bus, and then pull behind it toward the crowd. People from the crowd then started to flee toward the north corner of Madison and Lotus. He saw the man in the red shirt running from the back of the bus toward the corner with two other men. As he was running toward the corner, he was holding the left side of his waist. He also observed two officers with an unmarked police vehicle in front of the bus. One of the officers pointed toward the back of the bus, and then the other, male officer ran northwest to meet the three men who ran

from behind the bus. Regalado heard the officer yell "stop" and then saw the officer pull his weapon. The three men disappeared around the corner and the officer followed them down Lotus.

¶ 90    At that point, the light turned green, and Regalado started to drive away when he heard three gunshots. He did not actually see the shooting.

¶ 91    The defense then rested.

¶ 92    In rebuttal, plaintiff recalled Ellis, who reiterated certain portions of her previous testimony. Plaintiff also called Dr. Michael Slater, an emergency room doctor, who testified that given Smith's injuries, he would not have been physically or mentally capable of communicating clearly beyond basic, rudimentary information. He would not have been able to have a conversation using complete sentences while he was in the back of the ambulance.

¶ 93    Following closing arguments by the parties, the case was submitted to the jury. The jury returned a verdict in favor of plaintiff and against defendant in the amount of $5,097,193.70.

¶ 94    Following an unsuccessful posttrial motion for new trial, defendant instituted this appeal.

¶ 95                                    ANALYSIS

¶ 96    On appeal, defendant argues that (1) it was denied a fair trial when plaintiff's counsel improperly linked the special interrogatory to the general verdict during closing arguments; (2) the trial court refused defendant's request that IPI 5.01 be given based on plaintiff's failure to call certain family members as witnesses at trial; (3) the trial court erred in giving IPI 5.01 based on defendant's failure to produce certain dashcam videos at trial; and (4) the trial court erred in giving an instruction defining willful and wanton conduct as including reckless conduct. We address each of these contentions in turn and conclude none of them warrant reversal.

¶ 97                                    Special Interrogatory

¶ 98        Defendant first argues that it did not receive a fair trial where plaintiff's counsel improperly linked the special interrogatory to the general verdict by indicating that if the jury awarded plaintiff damages, then it was required to answer the special interrogatory in the negative. Defendant contends that the trial court erred in denying its motion for new trial on this basis. We will reverse the trial court's decision on a motion for new trial only where it is affirmatively shown that the trial court abused its discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). We cannot say that defendant has made such a showing here.

¶ 99        The purpose of a special interrogatory is to test the verdict against the jury's findings on the controlling factual issues. *Sommese v. Maling Bros., Inc.*, 36 Ill. 2d 263, 267 (1966). Attorneys are free to comment on a special interrogatory in closing arguments or to suggest how special interrogatories should be answered; they may not, however, tell a jury that it must conform its answer to a special interrogatory to its verdict or to reveal which party submitted the special interrogatory. *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 94 (2008).[2]

¶ 100       Although such improper comments may constitute reversible error, prejudice to the defendant can be averted if the trial court acts promptly to sustain objections or issue curative instructions and the comment is brief, innocuous, or ambiguous. *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 467-68 (1996); see also *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 340 (1996) (the plaintiff's argument that the jury should answer the special interrogatories "consistent with" the verdict did not require reversal where plaintiff's counsel made a single,

---

[2] Notably, the Illinois legislature amended section 2-1108 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1108 (West 2020)), allowing parties during closing arguments "to explain to the jury what may result if the general verdict is inconsistent with any special finding." Because the trial in this case took place before January 1, 2020, however, the amendment does not apply. *Id.* (stating that the amendment "applies only to trials commencing on or after January 1, 2020).

innocuous comment that did not advise the jury that an inconsistent answer to the special interrogatories would result in nullification of the verdict and did not identify the source of the special interrogatory and where the trial court gave a curative instruction to the jury that the special interrogatories should be answered based on the evidence); *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 652 (1987) (the plaintiff's counsel's argument that there could be no verdict for the plaintiff if the jury answered the special interrogatory in the affirmative did not merit reversal where it was ambiguous as to whether it was advising the jury of the legal or practical effect of answering the special interrogatory in a certain way, it was brief, and the trial court sustained the defendant's objection and gave a curative instruction). The trial court is in the best position to determine the prejudicial effect, if any, the improper comments had on the jury. *O'Connell*, 285 Ill. App. 3d at 464; see also *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 85 (noting that the trial court was in the best position to assess the impact on the jury of its comment regarding the relationship between the special interrogatory and the general verdict form).

¶ 101     At the very end of plaintiff's closing argument in this case, plaintiff's counsel made the following argument:

> "There is one more thing that I was reminded of. After you give the amounts that you are going to give, you are going to have what's called a special interrogatory. And this is a special interrogatory and it reads very much like the instructions that you are going to be read.
>
> So if you find, if you award the estate and Ramar and Dasha money damages, you are to say no here."

Defendant objected, and the trial court sustained that objection. Plaintiff's counsel continued by reading the special interrogatory:

> " 'At the time deadly force was used against Gary Smith, was it reasonable for any officer to use deadly force to believe such force was necessary to prevent imminent death or great bodily harm?' 'No.'
>
> And that would be—you do that after you assess the damages amount."

Defense counsel did not object to this second statement, and plaintiff's counsel then concluded her remarks.

¶ 102       During a break before defendant's closing argument, defendant moved for a mistrial based on plaintiff's counsel's argument regarding the special interrogatory. The trial court noted that plaintiff's counsel's argument was clearly improper and questioned the veracity of plaintiff's counsel's claims that the argument was inadvertent. Plaintiff's counsel insisted the error was unintentional and requested that the trial court give a curative instruction to the jury rather than grant a mistrial. Defendant argued that a curative instruction would not cure the defect, because the jury now knew that the general verdict and special interrogatory were linked. The trial court denied defendant's request for a mistrial, finding that although plaintiff's argument was blatant misconduct, it was not so prejudicial as to warrant mistrial. According to the trial court, the reference was made in passing and defendant's objection was sustained. The trial court also explained that it would give a curative instruction if defendant so wished and suggested that the parties confer and draft a curative instruction.

¶ 103       After the jury returned its verdict in favor of plaintiff, defendant renewed its motion for a mistrial on the basis of plaintiff's closing argument remarks on the special interrogatory. During the discussion of defendant's renewed motion, the trial court stated that an off-the-record

discussion had occurred at some point before the verdict, during which defendant elected to forgo a curative instruction. Defense counsel explained that defendant declined a curative instruction because it would not have remedied the prejudice that resulted from plaintiff's linking of the verdict and special interrogatory. In denying the renewed motion for mistrial, the trial court observed that although the misconduct was egregious, defendant never made a motion to strike the comments from the record, the trial court sustained the objection made by defendant, plaintiff's counsel's tone in making the comments was subdued, the comments were not part a very demonstrative part of the closing, the comment was not "drummed into [the jury's] head," and the comment was isolated and singular. For those reasons, the trial court concluded that although the argument was clearly improper, it did not warrant reversal.

¶ 104    Defendant raised the issue again in its motion for a new trial, and again, the trial court concluded that although plaintiff's counsel's comments were clearly improper, they were not so prejudicial as to warrant a new trial.

¶ 105    As the trial court did, we conclude that plaintiff's counsel's comment during closing argument that if the jury awarded plaintiff damages it was to answer the special interrogatory no was indisputably improper. It unequivocally informed the jury that its answer to the special interrogatory was dictated by its verdict.

¶ 106    Nevertheless, despite our agreement with defendant that plaintiff's counsel's comments were improper, we have no basis on which to conclude that the trial court abused its discretion in finding that the prejudice from those comments was not so great as to require a new trial. The record on appeal confirms that plaintiff's counsel's statements were an afterthought. She had thanked the jury for its time and attention, suggesting that her closing argument was coming to an end, before she remembered to address the special interrogatory. She made the objectionable

statement, defendant objected, and the trial court sustained that objection. Plaintiff's counsel then, as is allowed, suggested that the jury should answer the special interrogatory no after it addressed damages and ended her closing. The record does not suggest that any undue emphasis was placed on the improper comments or that plaintiff's counsel repeated the improper comments after the trial court sustained defendant's objection. Moreover, the trial court specifically noted that counsel's tone was subdued and undemonstrative at the time she made the comment, and the record on appeal gives us no reason to question this assessment. Given the trial court's superior position in assessing the prejudicial effect of such improper comments and the fact that the trial court concluded on three separate occasions that their prejudicial effect was minimal, we conclude that the trial court did not abuse its discretion in denying defendant's request for a new trial.

¶ 107        Defendant argues that the improper comments were sufficiently prejudicial to warrant reversal, because they were "the punctuation mark at the end of a long, emotional plea to the jury to compensate Smith's estate and his children for pain and suffering." Defendant does not make any contention that the rest of plaintiff's closing argument was improper, but instead contends that the prejudice from the improper comments was enhanced by the fact that they were made at the end of an emotional closing argument. We do not agree that the fact plaintiff appears to have given an otherwise effective closing argument means that the prejudice from the improper comments is somehow greater or that the trial erred in assessing the prejudicial impact of the statements.

¶ 108        We also note that the trial court offered to give a curative instruction to be fashioned by defense counsel. Defense counsel declined that offer on the basis that the prejudice from the improper comments could not be cured by such an instruction, because the jury had already been

informed of the link between the verdict and the special interrogatory. Defendant continues to maintain that position on appeal. Caselaw, however, refutes defendant's position that curative instructions do not mitigate the prejudice from such improper comments. See, *e.g.*, *White v. Stevens*, 301 Ill. App. 3d 709, 712 (1998) (finding that the improper comments in that case were especially serious where no curative instruction was given); *O'Connell*, 285 Ill. App. 3d at 468-69 (considering the lack of a curative instruction in concluding that the improper comments warranted reversal); *O'Neil*, 278 Ill. App. 3d at 340 (considering the curative instruction given by the trial court as a factor in concluding that the plaintiff's argument that the jury should answer the special interrogatories "consistent with" the verdict did not require reversal); *Levin*, 164 Ill. App. 3d at 652 (considering the given curative instruction as a factor in concluding that the plaintiff's counsel's argument that there could be no verdict for the plaintiff if the jury answered the special interrogatory in the affirmative did not merit reversal). Although we do not mean to imply that a curative instruction will always cure any and all prejudice from comments improperly linking verdicts and special interrogatories, we reject the notion that curative instructions can never have any mitigative effect on the prejudice resulting from such comments. Given that a curative instruction would have had at least some mitigative effect on the prejudice defendant claims to have suffered as a result of the improper comments, defendant's rejection of the trial court's offer of a curative instruction arguably constitutes waiver of any claim of prejudice. See *Dienstag v. Margolies*, 396 Ill. App. 3d 25, 40 (2009) (where the defendant declined the trial court's offer to instruct the jury to disregard the witness's improper reference to plaintiff's counsel as "doctor," there was no indication that defendant was prejudiced by the comment); *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 681-82 (2008)

(where a party refuses relief from the complained-of error, including offers of curative instructions, that party waives its right to complain of the error on appeal).

¶ 109                                  IPI 5.01—Family Members

¶ 110       Defendant also complains that the trial court erred in refusing its request to give IPI 5.01 based on plaintiff's failure to call four family members as witnesses at trial: Romaine Bland, Perry Coleman, Keyawonia Smith, and Demetrius Williams, Jr. Defendant argues that plaintiff identified these witnesses as being with Smith on the night of the shooting and, thus, her failure to call them at trial should give rise to an inference that their testimony would have been adverse to her case. A trial court's decision whether to give IPI 5.01 will not be reversed absent a clear abuse of discretion. *Koonce v. Pacilio*, 307 Ill. App. 3d 449, 461 (1999).

¶ 111       IPI 5.01 provides as follows:

> "If a party to this case has failed [to offer evidence] [to produce a witness] within his power to produce, you may infer that the [evidence] [testimony of the witness] would be adverse to that party if you believe each of the following elements:
>
> 1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence.
>
> 2. The [evidence] [witness] was not equally available to an adverse party.
>
> 3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.
>
> 4. No reasonable excuse for the failure has been shown."

To warrant giving this instruction, the moving party must present some foundational evidence on each of the four elements. *Graves v. Rosewood Care Center, Inc.*, 2012 IL App (5th) 100033, ¶ 45.

¶ 112    Here, the trial court refused to give IPI 5.01 with respect to the witnesses at issue on the basis that plaintiff was barred from calling them at trial by an order entered by the pretrial motion judge and, thus, had a reasonable excuse for not calling the witnesses. On March 28, 2017, prior to the first trial, the motion judge entered an order that read, "Any f(1) witness listed by either party who cannot be located for purposes of deposition will be barred as of June 1, 2017[,] and stricken from the parties' witness lists at trial." The record on appeal does not contain a transcript of the March 28, 2017, hearing at which the motion judge entered this order.

¶ 113    At a status hearing on October 12, 2017, defendant requested that the June 1, 2017, deadline set in the March 28, 2017, order be extended to November 15, 2017. In response, plaintiff's counsel represented that she had given the best addresses she had for the witnesses and could not be responsible if defendant was unable to locate them. The motion judge responded:

> "But, I mean, I'm not going to sit there and sanction you, but if any witness that's listed by any party who can't be located in order to be deposed, you know, how can that person be listed as a trial witness then? They'd just be stricken."

Following the hearing, the motion judge entered another order. This time it read, "Parties to provide lists of trial-ready witnesses pursuant to Rule 213(f)(1) & (f)(2) by 10/23/17. Any witness who cannot be located with a correct address by 11/15/17 may not be called at trial."

¶ 114    Defendant argues that this order was not a reasonable excuse for plaintiff failing to call the family member witnesses, because the order was a result of plaintiff's failure to provide valid addresses for the witnesses. In support, defendant cites *Panos v. McMahon*, 23 Ill. App. 3d 776

(1974). In that case, the plaintiff, in his answers to interrogatories, listed as witnesses to the accident at issue two family members who were passengers in his vehicle. *Id.* at 784-85. On the defendant's motion, the trial court entered an order directing the plaintiff to provide the defendant with the addresses of those witnesses and, if the plaintiff failed to do so, barring those witnesses at trial. *Id.* at 785. The plaintiff failed to provide the addresses to the defendant. *Id.* As a result, the trial court instructed the jury pursuant to IPI 5.01 and allowed the defendant to comment on the absence of those witnesses. *Id.* at 784. On appeal, the court rejected the plaintiff's contention that the trial court's order barring the witnesses made them unavailable to the plaintiff. *Id.* at 785. The court noted that the witnesses were the plaintiff's relatives and he knew their whereabouts; therefore, he could have avoided the effect of the order by providing the witnesses' addresses to the defendant. *Id.*

¶ 115 Although both this case and *Panos* involve orders that barred witnesses at trial based on missing addresses, *Panos* is distinguishable from the present case in an important respect. In *Panos*, the plaintiff knew the whereabouts of the witnesses, was specifically ordered to produce their addresses, and willfully withheld their addresses from the defendant. The order barring the witnesses was a sanction for the plaintiff's failure to comply with the trial court's order. In contrast, in this case, although defendant speculates that plaintiff should know the whereabouts of the witnesses because they were Smith's relatives and she frequently spent time with Smith, the record does not contain any definitive evidence regarding whether plaintiff had actual knowledge of their whereabouts.

¶ 116 Moreover, the order barring witnesses in *Panos* was imposed as a sanction for the plaintiff's willful withholding of the witnesses' addresses in violation of the trial court's clear directive. Here, based on the record before us, we are unable to conclude that the order barring

witnesses for whom a valid address could not be found was a sanction imposed on plaintiff for misconduct. Both the initial March 28, 2017, order and the October 12, 2017, extension order applied equally to both parties and neither order directed the disclosure of specific witness information. Moreover, the motion judge's comments at the October 12, 2017, suggest that the orders were intended as a case management mechanism, not a sanction for misconduct. We also note, however, that the record on appeal does not contain a transcript of the hearing on March 28, 2017. Therefore, to the extent that the initial order might have been entered as a sanction against plaintiff, we have no way of determining that. Because this doubt arises from the insufficiency of the record on appeal, we must resolve it against defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) ("[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant."). Therefore, we conclude that defendant has failed to demonstrate that the trial court abused its discretion in finding that plaintiff had a reasonable excuse for not calling the witnesses at trial, where she was barred from calling them by the motion judge's case management order.

¶ 117                                    IPI 5.01—Dashcam Videos

¶ 118          Defendant next argues that the trial court abused its discretion by giving IPI 5.01 with respect to the dashcam videos from the vehicles operated by Elarde and Klemens, Makropoulos and Dougherty, Saez and Ortiz, and Trakes and Mendez. According to defendant, plaintiff failed to present evidence satisfying the four elements justifying drawing an adverse inference. We

conclude that defendant has waived this claim for failing to make any objection to the giving of IPI 5.01 as it relates to the missing dashcam videos.

¶ 119     At the request of plaintiff, the trial court gave the following instruction based on IPI 5.01:

"If a party to this case has failed to offer evidence within his power to produce, you may infer that the evidence would be adverse to that party if you believe each of the following elements:

1. The evidence was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The evidence was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.

4. No reasonable excuse for the failure has been shown."

The given instruction was stated in general terms and did not explicitly refer to the missing dashcam videos or any other specific pieces of evidence.

¶ 120     "Enlightened trial practice does not permit counsel under the guise of trial strategy to sit idly by and permit instructions to be given the jury without specific objections and then be given the advantage of predicating error thereon by urging the error for the first time in a post-trial motion." *Doe v. Parrilo*, 2020 IL App (1st) 191286, ¶ 62 (internal quotations omitted). Accordingly, absent a specific objection during the jury instruction conference or when the instruction is read to the jury, a party waives any claim of error related to the giving of an instruction. *Id.*

¶ 121     Over the course of the trial, the parties and the trial court discussed IPI 5.01 on a number of occasions. At no point during these discussions did defendant register an objection to the

giving of the general IPI 5.01, much less as it specifically related to the missing dashcam videos or plaintiff's ability to satisfy the elements of IPI 5.01. In addition, after the close of evidence, the trial court informed the parties, "All right. So after the close of evidence I wanted to give the parties an opportunity to preserve any objections they had with respect to the jury instructions and to tender any instructions they wish that the Court has refused." Although defendant took advantage of this opportunity to preserve its objections to the trial court's rulings on other instructions, it did not mention IPI 5.01. Not only that, defendant did not object when plaintiff presented evidence related to the missing dashcam videos or argued the missing dashcam videos in closing arguments. On the record before us,[3] it appears that the first time defendant argued that IPI 5.01 should not have been given—with respect to the missing dashcam videos or otherwise—was in its posttrial motion for a new trial. This is not sufficient to preserve the alleged error, as issues may not be raised for the first time in a posttrial motion. See *Zdeb v. Baxter International, Inc.*, 297 Ill. App. 3d 622, 630 (1998).

¶ 122    Defendant argues that it preserved its objection to the giving of IPI 5.01 because it filed motions *in limine* to bar plaintiff from discussing the missing dashcam videos and argued at trial that plaintiff should be barred from eliciting testimony regarding the videos. Defendant's characterization of the cited motions and arguments, however, are not accurate. The two motions *in limine* that defendants cite were not motions *in limine* to preclude plaintiff's IPI 5.01 argument that defendant's failure to produce the dashcam videos gave rise to an inference that the videos would have been adverse to defendant. Instead, one was a motion to preclude

---

[3] It is clear from the record that there were several off-the-record discussions regarding the jury instructions to be given. To the extent that defendant might have objected to the giving of IPI 5.01 during one of those off-the-record discussions, the burden of providing a record on appeal demonstrating those objections was on defendant. *Foutch*, 99 Ill. 2d at 391-92 ("[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error.").

argument by plaintiff that the failure to collect and retain the videos, among 14 other alleged investigative failures by the CPD, constituted evidence that defendant failed to properly investigate Smith's shooting. The bases for this motion were that (1) the failure to properly investigate the shooting was not the proximate cause of plaintiff's injury, and (2) defendant was immune from liability based on the failure to properly investigate. The other was a motion to preclude plaintiff from arguing that not all CPD vehicles were equipped with operable cameras, because such evidence was irrelevant and because defendant did not have a duty to equip its vehicles with operable cameras. Neither of these motions mentioned IPI 5.01, the four missing dashcam videos at issue, any adverse inferences to be drawn from defendant's failure to produce those videos, or plaintiff's alleged failure to satisfy the four elements of IPI 5.01.

¶ 123    Likewise, the two portions of oral argument defendant cites as evidence that it has not waived this claim of error do not support its position. First, the transcripts to which defendant cites are not certified transcripts that were included in the report of proceedings portion of the record on appeal pursuant to Supreme Court Rule 323 (eff. July 1, 2017). Instead, the cited transcripts were simply attached as exhibits to defendant's motion for a new trial. Even putting this deficiency aside, however, the transcripts do not support the notion that defendant objected to plaintiff's argument under IPI 5.01 as it relates to the missing dashcam videos. Both transcripts reflect discussions of defendant's motion *in limine* regarding plaintiff's contention that defendant did not conduct a proper investigation and/or engaged in a cover up of the shooting. Defendant's argument during this discussion was that plaintiff should not be allowed to use the missing dashcam videos as evidence of a coverup. Defendant did not argue that plaintiff should not be allowed to reference the missing videos at all or that IPI 5.01 would be improper. In fact, at one point, the trial court told defendant with respect to the missing dashcam

videos, "And you might want to look at 5.01. I don't know if it's going to be tendered, but that's the law with respect to issues of that kind and it might be guidance as to how we argue this to the jury during the course of the trial and how we present evidence." It is clear from this comment that IPI 5.01 was not at issue at the time—it had not even been tendered as an instruction at that point.

¶ 124    In sum, defendant did not register a specific objection to IPI 5.01 during any of the jury instruction conferences on the record and raised no contention of error in that respect until it filed its posttrial motion. Defendant's motions *in limine*—which were filed and argued before plaintiff ever tendered IPI 5.01 and which sought to bar plaintiff's argument that the CPD failed to properly investigate the shooting and/or engaged in a coverup—were not a substitute for a specific objection to the giving of IPI 5.01. This is especially true where defendant had multiple opportunities to make a specific objection after plaintiff had tendered IPI 5.01 but chose not to. Accordingly, we conclude that defendant has waived review of this claimed error.

¶ 125                                  Willful and Wanton Instruction

¶ 126    Finally, defendant argues that the trial court erred in giving an instruction that defined willful and wanton conduct as including reckless conduct, because all evidence at trial was that the shooting was intentional. We conclude that even if defendant is correct that all of the evidence at trial was that the shooting was intentional, the inclusion of the reckless language in the willful and wanton instruction was not reversible error.

¶ 127    The threshold for giving a particular jury instruction is not a high one. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 549 (2008). Generally, so long as the instructions clearly and fairly instruct the jury, parties are entitled to have the jury instructed on each of their theories supported by the evidence. *Id.* The record need only contain some evidence supporting the

theory is necessary to justify the giving of the instruction, even if the evidence is insubstantial. *Id.* Whether the jury would be persuaded by the evidence does not matter. *Id.* It is within the trial court's discretion to give or deny a requested jury instruction. *Id.*

¶ 128    Illinois Pattern Instruction 14.01 provides:

"When I use the expression 'willful and wanton conduct' I mean a course of action which [shows actual or deliberate intention to harm] [or which, if not intentional] [shows an utter indifference to or conscious disregard for (a person's own safety) (and) (the safety of others)]."

The instruction that the trial court gave in this case read:

"When I use the expression 'willful and wanton conduct' I mean a course of action taken without legal justification which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to or conscious disregard for Gary Smith's safety."

¶ 129    In the trial court, plaintiff argued that the "utter indifference to or conscious disregard for" language, *i.e.*, the reckless language, was warranted based on evidence suggesting that Pachnik ran after Smith with his gun out and without knowing whether Smith was armed, grabbed Smith, ran past Smith, turned and started firing wildly before he realized Smith was unarmed, and failed to hit center mass. Plaintiff also argued that Teague and Elarde started shooting without knowing what was happening. The trial court sided with plaintiff, noting that only a scintilla of evidence was necessary to justify giving the instruction.

¶ 130    On appeal, defendant argues that the evidence plaintiff contended supported a conclusion that the officers were reckless goes only to the question of whether Smith was armed and whether Pachnik was justified in using deadly force, not whether Pachnik's conduct was

intentional or reckless. We are inclined to agree. As defendant points out on appeal, there is no dispute—either among the parties or within the evidence—that Pachnik's and the other officers' (assuming that officers other than Pachnik also fired their guns) conscious goal in pulling the trigger on their guns was to shoot Smith. None of the evidence suggested that any of the officers shot accidentally, intended to fire warning shots and hit Smith instead, or intended to shoot someone or something other than Smith. Plaintiff's arguments that Pachnik, Teague, and Elarde shot at Smith without being certain that he was armed and a threat to them and that Pachnik did not aim well do not speak to whether the officers acted intentionally or recklessly in shooting. Instead, these arguments are relevant only to whether the officers were justified in shooting and Pachnik's accuracy in shooting.

¶ 131       Despite our agreement that all of the evidence at trial was that the officer(s) intended to shoot Smith, we do not agree that any error in including the reckless language in the willful and wanton instruction warrants reversal and a new trial.

> "A faulty jury instruction does not require reversal unless the error results in serious prejudice to the party's right to a fair trial. [Citation.] In determining whether a party has been prejudiced, we consider whether the instructions, taken as a whole, were sufficiently clear so as not to mislead the jury. [Citation.] Even if [the complaining party] was prejudiced by the use of the [faulty instruction], there must be a reasonable basis supporting the conclusion that, but for the error, the verdict might have been different."

*Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121594, ¶ 87. Here, we can find no reasonable basis on which to conclude that absent the inclusion of the reckless language in the willful and wanton instruction, the jury might have returned a verdict in favor of defendant.

¶ 132    The jury was given the following instruction regarding the burden of proof in this case:

"The plaintiff has the burden of proving the following propositions:

That Pachnik and/or Teague and/or Elarde shot Gary Smith without legal justification; and

The conduct of Pachnik and/or Teague and/or Elarde was willful and wanton.

If you find from your consideration of all the evidence that these propositions have been proved, then your verdict should be for the plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant."

As discussed above, with respect to the definition of willful and wanton, the trial court instructed the jury:

"When I use the expression 'willful and wanton conduct' I mean a course of action taken without legal justification which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to or conscious disregard for Gary Smith's safety."

Finally, with respect to the determination of whether the officers were justified in their use of deadly force, the trial court instructed the jury:

"A police officer is legally justified in the use of force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent imminent death or great bodily harm."

Aside from the inclusion of the reckless language in the willful and wanton instruction, defendant does not contend that the trial court erred in giving the above instructions.

¶ 133    Taken together, these instructions required the jury to find the following in order to return a verdict for plaintiff:

(1) Pachnik, Teague, and/or Elarde shot Smith;

(2) the shooting was unjustified, *i.e.*, the officer(s) did not reasonably believe that shooting Smith was necessary to prevent imminent death or great bodily harm; and

(3) the conduct of the officer(s) was willful or wanton, *i.e.*, showed *either* (a) actual or deliberate intention to harm (was intentional), *or* (b) an utter indifference to or conscious disregard for Smith's safety (was reckless).

Because the jury returned a verdict in favor of plaintiff here, it necessarily must have found that plaintiff satisfied its burden in proving (1), (2), and either 3(a) or (3b).

¶ 134    When viewed in this fashion, it is easy to see why the allegedly erroneous definition of willful and wanton does not warrant reversal. With respect to the third—willful and wanton conduct—element of plaintiff's burden, plaintiff was required to prove either intentional or reckless conduct by the officers, not both. Defendant acknowledges—even argues—that all of the evidence at trial demonstrated that Pachnik shot Smith intentionally: "[I]t was undisputed that the shooting was intentional," and "[A]ll the evidence was of an intentional shooting." Accordingly, even if the trial court had not included the reckless language in the willful and wanton instruction, the evidence mandated a finding by the jury that the shooting was intentional, thereby satisfying the third element of plaintiff's burden. This is not a case in which the inclusion of the reckless language provided the jury with a basis on which to find that plaintiff satisfied the willful and wanton conduct element where it otherwise could not have; rather, even without the option of finding that plaintiff satisfied the willful and wanton conduct element by proving reckless conduct, the jury would still have been required to find that plaintiff

satisfied the willful and wanton conduct element based on the overwhelming evidence that the officers intended to shoot Smith. Therefore, because the jury still would have found the officers' conduct to be willful and wanton based on intentional conduct, even if the reckless language was not included in the willful and wanton instruction, there does not exist a reasonable basis on which to conclude that the verdict would have been different had the trial court not included the reckless language and any error in including it does not constitute reversible error.

¶ 135                                  CONCLUSION

¶ 136        For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 137        Affirmed.